THIRD DIVISION

March 15, 2000

No. 1-98-4373

LINDIE OSBORNE, ) Appeal from the

) Circuit Court of

Plaintiff, ) Cook County.

)

)

)

STAGES MUSIC HALL, INC., an )

Illinois corporation, Individually,) Honorable

and d/b/a CABARET METRO/SMART BAR, ) Sharon Johnson-Coleman,

) Judge Presiding.

Defendant. )

JUSTICE WOLFSON delivered the opinion of the court:

The question in this case is whether Stages Music Hall, Inc. (Stages), the owner of a nightclub on Clark Street in Chicago, owed a duty to protect its customer from a third-party criminal attack that took place just outside its entrance doors.

After hearing the plaintiff Lindie Osborne's (Osborne) evidence, the trial court directed a verdict in favor of Stages.  We reverse the trial court and remand for a new trial.

FACTS

At about 10:45 p.m. on October 19, 1993, Osborne and her friend, Michelle Becht, accompanied by Becht's boyfriend, Paul, and Paul's friend, Mike, arrived at a nightclub/bar on Clark Street in Chicago known as the Cabaret Metro (Metro).  They went to the Metro to see a band called "The Orb," which was scheduled to play at 11:00 p.m. that night.

When Osborne got to the club, there was a short line of people waiting to get in, standing behind barricades or "horses," which had been set up on the sidewalk leading to the front doors of the Metro.  After standing in line briefly, Osborne and her friends entered the building, passing through two sets of glass double doors, and into a hallway where a ticket booth was located.  After purchasing a ticket at the ticket booth, Osborne continued down the hallway to a place where a podium was set up and male bouncers were taking tickets and checking identification.  Osborne surrendered her ticket, showed her ID, and then turned left to go up the stairway to the second floor, where the Metro club was located.

Karl Trujillo testified he and his friends, Daniel Hosneola (Danny) (also known as Dusany Dollah or Dusany Dolan) and Colleen Smith, went to the Smart Bar at about 10:30 p.m. on October 19, 1993.  The entrance to the Smart Bar is located next door to the Metro.  Both bars are owned and operated by Stages.  Though both bars have separate entrances, they share an interior hallway.  Off this interior hallway, the Metro is accessed by climbing the north stairway; the Smart Bar is accessed by descending the south stairway.

Though Karl and Danny entered through the Smart Bar entrance, once inside Danny went to the Metro, while Karl went to the Smart Bar with Colleen.

Both Karl and Danny were under age (Karl was 19, Danny was 17), but they had identification stating otherwise.  Karl testified he drank six mixed drinks while he was at the Smart Bar and he became rather intoxicated.  He could not say how much Danny had to drink, but testified Danny also had been drinking alcoholic beverages that night.

At some point in time (the exact time was not established), Karl noticed Danny racing down the stairs to the Smart Bar, chased by eight or nine bouncers.  At the foot of the stairs, Karl said, the bouncers captured Danny and began hitting and kicking him.  Karl didn't know why the bouncers were scuffling with Danny, but he decided to help out his friend.

Karl said he tried to pull the bouncers off Danny, telling them to leave Danny alone.  The bouncers told Karl to mind his own business.  Karl, trained in martial arts, then began to fight with the bouncers, knocking two of them down.   Soon the bouncers were able to gain control over both Karl and Danny.  Karl and Danny were forcefully directed up the stairs and ejected from the Smart Bar.  The door to the bar was then locked.

Karl testified he and Danny first began banging on the doors to the Smart Bar.  Getting no response, they moved over to the doors of the Metro to try to get back inside.  Karl said they didn't get back inside through the Metro "because after this girl got in the way, they took her in and locked the door."
(footnote: 1)
Later at trial, Karl said he went to the door of the Metro after being ejected from the Smart Bar, tried the handle, and found that door was locked, too.  He pulled at the door handle, yelled at the bouncers, and gestured to the bouncers to let him inside.  Then, Karl said, he saw "someone come past me and I looked at them to like make the bouncers think that we were going to get into an altercation out there to make them come out, lure them out."  Karl said he gestured toward this female passerby and then "felt a push from behind my back."  He said he thought it was a bouncer, so he "did a spinning heel kick" and ended up striking a female individual "who got between me and the bouncer."  On cross-examination, Karl admitted he never saw the woman he kicked before he struck her.

 Osborne and Becht testified they left the Metro at about 12:40 a.m., leaving behind Paul and Mike.  At the foot of the stairway there were two male bouncers -- one sitting on a stool and the other one standing.  These bouncers asked if Osborne and Becht wanted their hands stamped so they could return to the club.  Osborne and Becht declined.

Osborne and Becht then turned right and entered the main hallway leading to the front doors.  A third bouncer was standing in this hallway, leaning on the wall.  He bid Osborne and Becht a "Good Night" as they passed by.

As they continued toward the front door, Osborne and Becht testified, they saw two males standing outside the building, pounding on the outside doors.  These men were yelling profanities at the bouncers, though the bouncers did not appear to be acknowledging them.

Osborne testified that one of the two men outside had very distinctive dreadlocks and she remembered seeing him inside the bar earlier that evening.  But neither Osborne nor Becht had seen these two men involved in a disturbance or altercation inside the bar.  Nor had they seen the two men being ejected.  Neither Osborne nor Becht knew why the two men were outside the bar, yelling and pounding on the door.  They also did not know how long these two men had been outside the bar.

Osborne and Becht testified they ignored the two men, dismissing them as a couple of rowdy guys who had a disagreement with the bouncers, which didn't involve them.  Becht walked through the two sets of double doors and onto the sidewalk outside the building.  At this time Osborne did not see the barricades or "horses" and she saw nothing blocking the sidewalk.  Becht, however, said the barricades still were on the sidewalk when they left.

As Becht began to walk away she noticed Osborne was not with her.  She turned to see Osborne standing inside the space between the two sets of double doors, putting on her coat.  Almost simultaneously, Becht said, she was slapped in the face by one of

of the two men who had been pounding on the doors.
(footnote: 2)  Osborne then ran out of Metro toward her, a matter of a few steps.  Becht said the two guys seemed to be walking away when, all of sudden, one of the guys spun around and kicked Osborne in the head.

Osborne's testimony was nearly identical.  She said when she saw Becht get slapped she immediately ran out of the building, yelling, "Stop."  As she approached Becht, one of the men swiftly spun around and, in karate fashion, kicked her in the face.  Osborne said she fell to the ground and struck her chin on the pavement.

After Osborne was kicked, the two men walked off.  One of Osborne's teeth was protruding beneath her lower lip and she was bleeding heavily.  Becht left Osborne and went to a bar called the Wrigleyville Tap, located south of the Smart Bar, to get some ice.  When she returned with the ice, she learned Osborne had been taken inside the Metro.  Becht was led to an office area inside the Metro, where Osborne was being questioned by two police officers.

Osborne testified that people walking along the busy sidewalk (there are several bars located in this area) came to her aide as Becht ran to get ice.  Some bouncers from the Metro came out and carried her inside to an office.  The police arrived and came to the office to speak with her about the incident.

After briefly questioning Osborne at the Metro, the police asked Becht to drive Osborne to the police station at Belmont and Western.  The two men who attacked them had been apprehended and were being held at the station.  There, Becht and Osborne identified the two men who had attacked them.

Both Becht and Osborne previously believed Danny (the man with the dreadlocks) had been their attacker.  That is what they testified to in their depositions.  They admitted at trial, however, that everything happened so quickly they could have been mistaken.

After leaving the police station, Becht took Osborne to the Ravenswood Hospital.  Osborne received stitches for the cut under her lower lip.  Later that same day, Osborne was seen by Dr. Elliott Ostro, who testified to Osborne's injuries.

Dr. Ostro said X-rays revealed Osborne suffered two fractures to her lower jaw.  He performed surgery on Osborne, permanently affixing plates and pins to her jaw bone.  Osborne's jaws were wired shut for six weeks.

After this evidence was presented, plaintiff rested her case.  Stages moved for a directed verdict, which the court granted.  The court found, as a matter of law, Stages owed no duty to Osborne because the incident occurred on the public sidewalk and because Karl Trujillo's actions were not reasonably foreseeable by Stages.

Osborne appeals from the directed verdict granted to Stages.

DECISION

A directed verdict should be granted only where all of the evidence, viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could stand.  
Pedrick v. Peoria & Eastern RR. Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967).

In this case, the trial court granted Stages' motion for directed verdict, finding plaintiff failed to establish facts sufficient to show Stages owed her a duty to protect her from a criminal attack by a third party.

Since Stages would be entitled to a directed verdict if no duty were owed Osborne, the dispositive issue for this court to resolve is whether a duty existed.  Without the existence of a duty, there can be no recovery.  
Rowe v. State Bank of Lombard
, 125 Ill. 2d 203, 531 N.E.2d 1358 (1988).

Whether a duty exists is a question of law.  
Kuzmanich v. Cobb
, 276 Ill. App. 3d 634, 637, 659 N.E.2d 39 (1995).
  But it is not a simple question:

"Whether a duty exists is also an inquiry shaped by public policy (
Kirk v. Michael Reese Hospital & Medical Center
, 117 Ill. 2d 507, 525, 513 N.E.2d 387 (1987); 
Ward v. K-mart Corp.
, 136 Ill. 2d at 140) since we must decide whether defendant and plaintiff stand in such a relationship to one another that the law imposes on defendant an obligation of reasonable conduct for the benefit of plaintiff (
Ward
, 136 Ill. 2d at 140).  Accordingly, we consider not only the reasonable (1) foreseeability and (2) likelihood of injury, but also (3) the magnitude of the burden on defendant in guarding against injury and (4) the consequences of placing that burden on defendant.  
Ward
, 136 Ill. 2d at 140-41."  
LaFever v. Kemlite Co., a Div. of Dyrotech Industries, Inc.
, 185 Ill. 2d 380, 388-89, 706 N.E.2d 441 (1998).

In general, a landowner has no duty to protect persons from criminal activity of third parties on his property unless there exists a "special relationship" between the parties.  Restatement (Second) of Torts, sec. 314 (1965).  "Illinois Courts recognize four special relationships which impose a legal duty to warn or protect a person from harm, i.e., (1) carrier-passenger;  (2) innkeeper-guest;  (3) business inviter and invitee, and (4) one who voluntarily takes custody of another in such a manner that it deprives the person of his normal opportunities for protection."  
Lutz v. Goodlife Entertainment, Inc.
, 208 Ill. App. 3d 565, 569, 567 N.E.2d 477 (1990).  Osborne was a business invitee of Stages.

But even if a "special relationship" exists, as it does here, no duty to protect against criminal acts will be imposed unless the incident should reasonably have been foreseen by the owner.  
Rowe
, 125 Ill. 2d at 215-16; 
Getson v. Edifice Lounge, Inc.
  117 Ill. App. 3d 707, 711, 453 N.E.2d 131 (1983).

It is essential that the incident is not just foreseeable, but reasonably foreseeable.  It must be "objectively reasonable to expect, not merely what might conceivably occur."  
Benner v. Bell
, 236 Ill. App. 3d 761, 766, 602 N.E.2d 896 (1992).  "Where injury results from freakish, bizarre or fantastic circumstances, no duty is present and no negligence claim can be asserted."  
Washington v. City of Chicago
, 188 Ill. 2d 235, 240, 720 N.E.2d 1030 (1999).  "Since anyone can foresee the commission of a crime virtually anywhere at any time * * * The question is not simply whether a criminal event is foreseeable, but whether a 
duty
 exists to take measures to guard against it." (Emphasis in original.)  
Hill v. Charlie Club, Inc.
, 279 Ill. App. 3d 754, 665 N.E.2d 321 (1996), quoting 
Bence v. Crawford Savings and Loan Ass'n
, 80 Ill. App. 3d 491, 400 N.E.2d 39 (1980).

Since foreseeability is measured by the individual facts and circumstances of each case (
Yangas v. Charlie Club, Inc
., 113 Ill. App. 3d 398, 403, 447 N.E.2d 484 (1983)), we look to the facts of this case to decide whether Stages owed a duty to Osborne to protect her from the assault outside the Metro Club.

The first matter to be addressed is the location of the attack.  Osborne and her friend Becht had already left the Metro and were just outside the doors of Metro's main entrance when the assault took place.

Several cases have held a person no longer qualifies as a business invitee once he/she leaves the establishment.  See 
Lewis v. Razzberries, Inc.
, 222 Ill. App. 3d 843, 584 N.E.2d 437 (1991)(duty of care did not extend outside the tavern owner's legal boundaries to an adjacent parking lot); 
Badillo v. DeVivo
, 161 Ill. App. 3d 596, 515 N.E.2d 681 (1987)(no duty to plaintiff attacked one-half block from defendant's property);  
St. Phillips v. O'Donnell
, 137 Ill. App. 3d 639, 484 N.E.2d 1209 (1985)(operator of tavern located in shopping center, where operator shared right to use common parking areas, did not have duty to protect patron, who was assaulted in common parking area by another patron who had been ejected from tavern).

We do not read these cases as creating an insurmountable barrier to the existence of a duty.  Here, we decline to hold Stages' duty to its patrons stopped at the doors of the premises, especially where Stages used the sidewalk to control entry by customers.

Whether the assault takes place in or outside the actual premises of the business owner, the dispositive factor remains the reasonable foreseeability of the actions taken by the third party.  See 
Shortall v. Hawkeye Bar and Grill
, 283 Ill. App. 3d 439, 670 N.E.2d 768 (1996)(tavern owner may not avoid duty to protect against criminal attack by third parties simply because the disturbance occurs just outside the front door); 
Rodgers v. Hook-SuperX, Inc.
, 204 Ill. App. 3d 861, 562 N.E.2d 358 (1990)(no duty to protect customer from attack in parking lot where actions of attackers were not reasonably foreseeable); 
Getson v. Edifice Lounge, Inc.
, 117 Ill. App. 3d 707, 453 N.E.2d 131 (1983)(motorcycle gang-related fight in parking lot outside tavern, which lasted less than a minute, was not reasonably foreseeable to tavern owner).

In 
Shortall
, this court refused to find, as a matter of law, no duty existed simply because the fight took place outside the tavern.  Since summary judgment had been granted to the defendant and there was a dispute over the facts of the case, the court reversed and remanded, holding there was a genuine issue of material fact whether the attack was reasonably foreseeable to the tavern owner.

Based on 
Shortall
 and the other cited cases, we cannot say the fact that the assault in this case took place on a public sidewalk just outside the Metro club disposes of the duty issue.  We go on, then, to determine whether, under the facts of this case, the assault on Osborne was reasonably foreseeable so as to give rise to a legal duty to Metro to protect her.

There is some evidence to support the conclusion that the attack was reasonably foreseeable.  Unlike Osborne and Becht, Metro's bouncers knew the two men outside the club were intoxicated, combative, and angry.

The bouncers knew Karl and Danny had been involved in a physical altercation inside the club.  During this disturbance the two men displayed a willingness to engage in combat with several large, male bouncers.  After being ejected, the two men did not show signs of cooling off.  Instead, the two men continued to pound on the doors, swearing at and gesturing to the bouncers, indicating they wanted to continue the fight.

Though the bouncers could observe the two men's behavior from inside the club, they did nothing after locking the Metro doors.  After ejecting the two men from the club, the bouncers did not supervise or concern themselves with the area in front of the bar -- an area over which the club had earlier exercised control by erecting barriers or "horses" to control the flow of traffic.

In short, the bouncers exported the club's problems to the sidewalk and then ignored the troublemakers while allowing two female patrons to leave through locked doors into the path of potentially dangerous men.

Because of what the bouncers knew about the two men, it could be said it was reasonably foreseeable that a patron would be attacked upon exiting the club and, therefore, it was incumbent on the club to guard against such an occurrence.

We do not impose a great burden on Stages when we conclude it owed Osborne a duty.  Measures easily could have been taken to protect her against the apparent danger.  Whether a simple warning would have been enough in this case is something we need not decide, but it certainly would not be asking too much of the cadre of bouncers.

We conclude the trial court erred when it directed a verdict against Osborne.  We reverse the trial court's judgment and remand for a new trial.

Reversed and remanded.

CERDA, and BURKE, JJ., concur. 

FOOTNOTES
1:
In a sworn statement Karl gave to the attorneys previously, Karl said he and Danny had been in front of the Smart Bar and never moved over to the door of the Metro.  At trial, Karl said he had been mistaken.  He said he and Danny moved over to the doors of the Metro because the doors to the Smart Bar had been locked.  They went to the Metro to attempt to re-enter.

2:
During Becht's cross-examination, part of Becht's deposition was read.  In that excerpt, Becht said the two men who had been yelling at the bouncers began to walk past her as she was waiting for Osborne to exit the Metro.  One of them brushed past her and said, "Get out of my way, white bitch."  Becht said she looked at the man, "stunned" by his comment.  It was then that he slapped her across the face.