301 Ga. 323
FINAL COPY

S16G0743, S16G0750,  MARTIN v. SIX FLAGS OVER GEORGIA II, L.P.
et al.; and vice versa.

GRANT, Justice.

Joshua Martin sustained life-changing injuries in a brutal attack at a bus

stop outside the Six Flags Over Georgia amusement park in July 2007.  A jury

determined that Six Flags[1] was liable for those injuries, along with the four

named individual defendants who perpetrated the attack; as set out by the jury

on its verdict form, the trial court apportioned the jury's $35 million verdict[2]

between the parties, assigning 92% against Six Flags and 2% each against the

four assailants.  On cross-appeals by Six Flags and Martin, a majority of the

twelve-member Court of Appeals found no error in the jury's determination

regarding Six Flags' liability but concluded that the trial court had erred in its

pretrial rulings regarding apportionment of fault, necessitating a full retrial.  *Six*

---

[1] Throughout this opinion, we use "Six Flags" to denote both corporate entities
named in Martin's complaint, Six Flags Over Georgia II, L.P., and Six Flags
Over Georgia, LLC.

[2] Although Six Flags has suggested that the damages awarded by the jury were
excessive, the company has not challenged that aspect of the verdict on appeal.

*Flags Over Georgia II, L.P. v. Martin*, 335 Ga. App. 350 (780 SE2d 796) (2015). We granted certiorari to determine (1) whether Six Flags could properly be held liable for the injuries inflicted in this attack; and (2) assuming liability was proper, whether the trial court's apportionment error does indeed require a full retrial.

For the first question, regarding the contours of premises liability, we agree that the jury was authorized to find Six Flags liable for the breach of its duty to exercise ordinary care in keeping its premises safe for invitees, although for a different reason than that articulated by the Court of Appeals. Because the attack that caused Martin's injuries began while both he and his assailants were on Six Flags property, Six Flags' liability is not extinguished simply because Martin stepped outside the property's boundaries while attempting to distance himself from his attackers.

As to the second question, we conclude that the trial court's apportionment error does not require a full retrial, but rather requires retrial only for the apportionment of damages. Accordingly, we reverse the judgment of the Court of Appeals insofar as it held that a full retrial is required, and we remand for further proceedings consistent with this opinion.

2

# I.

Construing the evidence to support the jury's verdict, see *Citizens & Southern Nat. Bank*, 254 Ga. 131, 136 (1) (327 SE2d 192) (1985), the record establishes the following facts. On July 3, 2007, Martin went to Six Flags for the day with his brother, Gerard Martin, and a friend, Devon Carter. As the park's closing time approached, the trio exited the park, walked to a nearby hotel to use the bathroom, and returned to Six Flags property in front of the park entrance to await the arrival of a Cobb County Transit (CCT) bus. The three sat on a guardrail in an area adjacent to the park's main entrance along Six Flags Parkway, the roadway leading into the park. The bus stop, which was visible from the guardrail, was situated just around the corner of the intersection of Six Flags Parkway and another public road, some 200 or so feet from the Six Flags property line.

During the course of the day and early evening, a throng of young men were roaming the park. Throughout the day their numbers ranged from 15 to 40. The young men in the group, which included several off-duty Six Flags employees, were dressed similarly, most in some combination of white or black T-shirts, jeans, and bandanas. The men were observed running through the

3

park, yelling obscenities, and otherwise causing commotion. In the early evening, park patrons John Tapp and Eric Queen, who were visiting the park with their families, were accosted by the group after one of its members nearly knocked over Queen's young son. Tapp testified that, after he diverted the near-collision and admonished the man who was running, approximately 15 men surrounded him and Queen, "fixing to beat the sh*t out of us." The confrontation lasted five to ten minutes, until park security appeared. As security approached and the group began to back off, they made "finger gun" gestures and admonished Tapp and Queen to "watch your back," "we'll get you in the parking lot." Tapp and Queen reported to the security officer what had happened, including the parking lot threat. The officers confronted the assailants they could locate, reprimanded them, and released them back into the park. A Six Flags security officer testified at trial that this response was contrary to Six Flags' policy, under which the assailants should have been ejected from the park.

Shortly before closing time, as the Tapp and Queen families prepared to exit through the park's main gates, they noticed the same group of men, whose numbers had grown to approximately 40. Surveillance video footage filmed at

that time showed a group of similarly-dressed men running to the front gate in what one witness described as a "frenzy." The group exited the park, followed by security guards, who then stood outside watching. Once the guards reentered the park, the families, believing the group had left, exited the gates toward the parking lot, only to find the same group congregated on the sidewalk, outside the gates but still on Six Flags property. Despite their efforts to be inconspicuous, the families were spotted by the group, who began following the families and yelling at them. Alarmed, the families hurried to their cars; Tapp heard one man say "drop the hammer," which Tapp believed was a reference to a gun. The families reached their cars and were able to depart without further incident.

The group of young men then made their way back to the area outside the park's main gate where Martin and his companions were sitting. Two members of the group testified that others within the group were actively planning a fight. One stated that when he met up with the group he "found out that they were going to fight people at the bus stop"; another said that he heard the group planning for the beating and that the group "knew they needed to fight somebody." Aware of the group's presence, and overhearing talk to the effect

5

that "some guy's going to get messed up," Martin and his companions got up from the rail to move away, proceeding toward the bus stop. The group followed the trio to the bus stop, where, without any provocation or delay, defendant Franklin approached Martin and began beating him with brass knuckles. Others among the group joined in on the attack, with one witness estimating that nine people participated in Martin's beating. This same witness testified that the attack began only five minutes after the group concluded their pursuit of the Tapp and Queen families; Franklin, similarly, testified that "it happened so fast." Carter and Martin's brother Gerard were also victims in the attack. The beating and stomping inflicted on Martin rendered him comatose for seven days, and resulted in debilitating permanent brain damage and other injuries.

The ensuing police investigation revealed that the assailants were affiliated with a gang-like group called the "YGL," and other evidence established that the park was routinely the site of gang congregation and activity. Multiple witnesses testified to the presence of gang members at the park, both as patrons and employees; one witness, who was himself a Six Flags employee, testified that the "majority" of Six Flags' park employees were

6

affiliated with one gang or another. Evidence of gang "tags" and similar graffiti in the male employees' locker room, and the testimony of a Cobb County police officer who worked off-duty as a park security officer, indicated that Six Flags' management was — or should have been — aware that many of its employees were gang members. A Six Flags security officer testified that, during the park's daily security briefings, gang-related issues were reported, on average, at least once a week. Following the attack on Martin, one Six Flags employee was reprimanded by her superiors after reporting to the media that gang members frequented the park, often bullying others.

Nearly one year to the day prior to the attack on Martin, Six Flags had been the site of a gang-related drive-by shooting. According to the Cobb County police officer who investigated the incident, a fight involving gang members had erupted in line at one of the park's rides, and the fight continued as the participants left the park. Approximately 20 minutes after the fight began, the intended target of the shooting was standing at a bus stop located within Six Flags' west parking lot and was approached by a car whose passenger, a member of the "Southside Mafia" gang, called out, referring to the earlier incident. The passenger then fired a pistol, missing his target but hitting three

Six Flags employees who were standing nearby. Remarkably, despite their injuries, none of these employees were willing to make a statement to police. The investigating officer testified that, a few days after the incident, a Six Flags official contacted him seeking assurances that the police would "not release any information that would lead the public to believe that Six Flags Over Georgia was anything but a safe, family atmosphere." This officer further testified that he had refused to make any such commitment, and that he had told this official that he would not take his own family to Six Flags, "[b]ecause of the numerous incidents that I've responded to there, the criminal gang activity that goes on there." According to this witness, 18 to 20 percent of the Cobb County Police Department's call volume per day comes from within a two-mile radius of Six Flags.

The Cobb County police officer responsible for coordinating off-duty police working at Six Flags testified that he had advised the park's president and security manager on several occasions that the park needed a police presence at all times during operating hours, but had been told the park's budget could not accommodate that need. A Six Flags security officer similarly testified that the park's security department lacked adequate resources; that its security

equipment and technology were outdated, and in some cases inoperable; and that management devoted more resources to "loss prevention" — avoiding the loss of money and goods — than to the physical safety and security of its patrons and employees. This same officer, who was on duty the night Martin was attacked, opined that, had Six Flags followed its protocol in response to the earlier incident with the Tapp and Queen families, the attack on Martin likely would not have occurred.

## II.

The starting point for our inquiry is the nature of the duty Six Flags owed to Martin, its patron. The duty owed by a landowner to its invitee is set out in our Code:

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.

OCGA § 51-3-1.[3]

---

[3] While Martin's status as a Six Flags invitee — rather than a licensee, to whom a landowner owes a lesser duty of care, see OCGA § 51-3-2 — was contested by Six Flags at trial, that issue was resolved favorably to Martin at trial and has not been pursued on appeal. See *Six Flags*, 335 Ga. App. at 360, n.35 ("because Six Flags has never argued that Martin lost his status as an invitee before he was attacked, it has waived that argument"). That is not to say that a patron cannot

9

With regard to potential criminal attacks by third parties, the landowner is "not the insurer of the invitee's safety," but nonetheless is required "to exercise ordinary care to protect the invitee from unreasonable risks of which he or she has superior knowledge." *Lau's Corp. v. Haskins*, 261 Ga. 491, 492 (1) (405 SE2d 474) (1991). If there is reason to anticipate some criminal conduct, the landowner must exercise ordinary care to protect its invitees from injuries caused by such conduct, but landowners need not guard against imagined dangers. Id. In other words, the landowner's duty "extends *only* to *foreseeable* criminal acts." *Sturbridge Partners v. Walker*, 267 Ga. 785, 786 (482 SE2d 339) (1997) (emphasis in original).

In the ordinary case involving landowner liability for third-party criminal acts, the criminal act has been committed and completed within the physical boundaries of the landowner's premises. See, e.g., *Days Inns of America v. Matt*, 265 Ga. 235 (454 SE2d 507) (1995) (affirming denial of hotel's motion for summary judgment where hotel guest was attacked by assailant on hotel premises); *TGM Ashley Lakes. v. Jennings*, 264 Ga. App. 456 (2) (590 SE2d

_____

lose invitee status by departing the premises before returning at some later time, but we need not draw the contours of that scenario in this opinion because the point was not contested here.

807) (2003) (affirming jury verdict against apartment complex owner for wrongful death of tenant killed in her apartment); *Piggly Wiggly Southern v. Snowden*, 219 Ga. App. 148, 149 (464 SE2d 220) (1995) (affirming jury verdict for store invitee for injuries sustained in criminal attack in store parking lot). Here, however, the facts developed at trial show that the physical attack on Martin was perpetrated outside the boundaries of Six Flags' property.[4] But the evidence also reflects that Martin's injuries were the culmination of a continuous string of events that were planned on Six Flags property, were executed at least in part on Six Flags property, and were the result of a failure by Six Flags to "exercise ordinary care to protect [its] invitee from unreasonable risks" that Six Flags understood, and even tried to obscure from its patrons. See *Lau's Corp.*, 261 Ga. at 492.

Under those circumstances, the question put to this Court is whether Six Flags can evade liability for the foreseeable consequence of its failure to exercise ordinary care in keeping its premises safe, simply because its patron had moved off those premises in an attempt to distance himself from his

---

[4] While the precise location where the physical attack began is the subject of conflicting testimony, there is ample evidence supporting a conclusion that the attack occurred at or around the bus stop.

attackers. The answer to that question is no. As we explain below, while Six Flags did not exercise the level of control and dominion required to assume liability for the bus stop as part of the park's "approaches," the victim's stepping over the property line does not and cannot insulate Six Flags from responsibility for an attack that began within its premises and that was the foreseeable result of the breach of its duty of care.

A.

This case stands for the common sense proposition that a property owner does not escape liability for an attack that begins on its premises simply because the victim moves outside the premises before the attack is completed. Nothing in OCGA § 51-3-1 requires that the injuries caused by a property owner's failure to exercise due care actually be inflicted within the four corners of a landowner's premises and approaches in order for liability to attach. Our Court of Appeals has recognized as much, holding that a store owner could be liable for injuries suffered by a customer who was mugged after walking off the store premises into a nearby vacant area. *Wilks v. Piggly Wiggly Southern*, 207 Ga. App. 842 (429 SE2d 322) (1993). Significantly, there was evidence in *Wilks* that the assailants had been loitering on the store's premises looking for

12

potential victims and followed the customer as he departed. Id. at 842. There was also evidence that a similar crime, also involving perpetrators loitering on the store premises, had occurred two or three months prior and that the store owner had knowledge of this prior crime. Id. at 843. Combined, that evidence was sufficient to create a jury question as to whether the store owner, having had reason to anticipate a criminal act, breached its duty of care to guard against injuries resulting from such an act. Id. (citing *Lau's Corp.*, 261 Ga. at 492).

In essence, *Wilks* recognized that a landowner's liability for an invitee's injuries from an attack that originates on the premises does not dissipate as soon as the invitee steps — or flees — off the property, so long as the invitee's injuries were proximately caused by the landowner's failure to exercise ordinary care in maintaining safety and security within its premises and approaches. Id. at 843; see also *Double View Ventures v. Polite*, 326 Ga. App. 555, 560 (1) (757 SE2d 172) (2014) (where criminal attack took place along footpath between apartment complex and gas station, both apartment complex owner and gas station owner could be liable for their respective failures to provide adequate security, regardless of the precise location of the attack). We now expressly adopt this narrow principle, and hold that although the landowner's duty is to

13

maintain safety and security within its premises and approaches, liability may arise from a breach of that duty that proximately causes injuries even if the resulting injury ultimately is completed beyond that territorial sphere. See *Wilks*, 207 Ga. App. at 843. See also, e.g., *Silva v. Spohn Health Sys. Corp.*, 951 SW2d 91, 95 (Tex. Ct. App. 1997) (mere fact that appellant "had stepped across the imaginary line" separating appellee's property and public sidewalk did not as a matter of law remove appellant "from the ambit of appellee's duty").[5]

As noted above, the landowner's duty is to protect its invitees against "unreasonable risks" of which it has "superior knowledge." *Lau's Corp.*, 261

---

[5] This principle has been recognized in other jurisdictions. See, e.g., *Reynolds v. CB Sports Bar*, 623 F3d 1143, 1152 (7th Cir. 2010) (applying Illinois law, holding that sports bar owner could be held liable in connection with attempted criminal attack on bar patron more than a mile away from bar if bartender knew of plan to sexually exploit the plaintiff off premises); *Osborne v. Stages Music Hall*, 726 NE2d 728, 733-734 (Ill. App. 2000) (reversing directed verdict in favor of bar owner, holding that owner could be liable to bar patron for injuries sustained in assault on sidewalk outside bar's premises); *Silva*, *v*. 951 SW2d 91 (reversing summary judgment, holding that hospital could be held liable for employee-invitee's injuries sustained when she was stabbed as she was entering an automobile on an adjacent street after leaving work); *Schneider v. Nectarine Ballroom*, 514 NW2d 486, 488-489 (Mich. Ct. App. 1994) (reversing summary disposition, holding that bar owner could be liable for injuries sustained by patron when altercation inside bar resumed outside bar after patron was ejected "into the waiting arms" of his assailants); *Udy v. Calvary Corp.*, 780 P2d 1055, 1060 (Ariz. Ct. App. 1989) (reversing summary judgment, holding that landlord could be liable for injuries sustained outside the premises if such injuries were reasonably foreseeable result of its negligence in operating the premises).

14

Ga. at 492. Thus, in assessing the scope of a landowner's duty to invitees with respect to off-premises incidents, one key is the foreseeability of the incident giving rise to such injuries. See *Wilks*, 207 Ga. App. at 843 ("'[i]f the proprietor has reason to anticipate a criminal act, he or she then has a duty to exercise ordinary care to guard against injury from dangerous characters'" (quoting *Lau's Corp.*, 261 Ga. at 492)); see also *Osborne v. Stages Music Hall*, 726 NE2d 728, 733 (Ill. App. 2000) ("[w]hether the assault takes place in or outside the actual premises of the business owner, the dispositive factor remains the reasonable foreseeability of the actions taken by the third party"); *Udy v. Calvary Corp.*, 780 P2d 1055, 1059 (Ariz. Ct. App. 1989) ("'(o)nce a duty is established, the foreseeability of harm governs the scope of that duty'" (citation omitted)); *Silva*, 951 SW2d at 94 ("if criminal acts of third parties are reasonably foreseeable, the owner or occupier is required to undertake definite precautions on behalf of its invitees" (emphasis omitted)).

As we have held in the context of on-premises crime, the foreseeability of future criminal acts may be established by evidence of prior criminal acts of a "substantially similar" nature to those at issue, such that "a reasonable person would take ordinary precautions to protect his or her customers . . . against the

risk posed by that type of activity." *Sturbridge Partners*, 267 Ga. at 786; see also *Lau's Corp.*, 261 Ga. at 492 (1). An establishment's location in a high crime area may also support the finding of a duty on the part of the landowner to guard against criminal attacks. Id. at 492-493; *Woodall v. Rivermont Apts. Ltd. Partnership*, 239 Ga. App. 36, 40-41 (520 SE2d 741) (1999); *Snowden*, 219 Ga. App. at 149. And evidence that the landowner had knowledge of a volatile situation brewing on the premises can establish foreseeability as well. See, e.g., *Good Ol' Days Downtown v. Yancey*, 209 Ga. App. 696, 697 (2) (434 SE2d 740) (1993) (summary judgment improper where bar owner's employees witnessed escalation of hostile behavior for more than five minutes prior to assault on patron).

In the context of crimes that are ultimately completed off premises, also relevant to foreseeability are the physical proximity of the crime site to the actual premises and the temporal proximity of the crime to the invitee's presence on the premises. See, e.g., *Wilks*, 207 Ga. App. at 843 (attack occurred 20 to 25 yards beyond grocery store, immediately upon customer's exit from premises); see also *Osborne*, 726 NE2d at 733 (assault occurred on sidewalk outside bar immediately after patrons exited premises); *Silva*, 951 SW2d at 93 (attack

16

occurred as hospital employee, having just completed her shift, stood on curb adjoining public street awaiting her ride home); *Holiday Inns v. Shelburne*, 576 So2d 322, 328 (Fla. Dist. Ct. App. 1991) (liability could lie where off-premises attack "began on [landowner's] property and spilled over onto the adjacent parking lot . . . only minutes after the individuals had crossed the property line"), disapproved on other grounds by *Angrand v. Key*, 657 So2d 1146, 1149-1150 (Fla. 1995). These parameters are necessary to ensure that a landowner's liability to its invitees maintains its connection to the landowner-invitee relationship giving rise to the duty in the first place. The landowner's duty is to take the steps within its premises that are necessary to protect its invitees from risks that could reasonably be foreseen in connection with the invitee's presence on the premises, which necessarily requires both temporal and physical proximity between the invitee's presence on the premises and the incident giving rise to his injuries.

Here, a gang-related attack on a park patron was reasonably foreseeable, both in the abstract and on the particular night in question. There was evidence that gang members had infiltrated the ranks of the Six Flags employee base and that Six Flags management was aware of this fact; that disturbances by gang

17

members at the park were routine and often a topic of daily security briefings; that the men's employee locker room was adorned with gang graffiti; and that one gang-related fight had previously migrated from the park to a nearby bus stop, culminating in a drive-by shooting. In addition, there was evidence that the particular perpetrators here were known by park security to have terrorized the Tapp and Queen families on the evening in question; that a large group of similarly dressed young men approached the park gates in a "frenzy" as the park closed; and that security officers simply stood and watched this group exit the main gates. Six Flags' knowledge of these risks — as well as its attempts to keep that information from the public — were also documented at trial.

Trial evidence also shows that the attack itself was actually conceived while both the assailants and the victims were on Six Flags property and that it was perpetrated almost immediately after Martin and his companions left the property headed for the bus stop. All of this evidence amply supports a conclusion that the attack on Martin was foreseeable. See *Sturbridge*, 267 Ga. at 786 (whether a criminal attack was reasonably foreseeable is a question for the jury). Accordingly, the attack on Martin was within the realm of unreasonable risks of which Six Flags had superior knowledge and against

18

which it had a duty to protect its invitees. Under the circumstances presented here, this duty extended to Martin even as he stepped over the park's property line and onto the public way encompassing the CCT bus stop. Having reached this conclusion, we affirm the Court of Appeals — albeit under a different rationale than that court — insofar as it affirmed the judgment below on liability.[6]

## B.

Although the same set of facts supports both our rationale and that of the Court of Appeals, we disagree with the Court of Appeals' conclusion that these facts establish that the attack on Martin took place entirely within Six Flags' "premises and approaches" under OCGA § 51-3-1. *Six Flags*, 335 Ga. App. at 352-360. In short, Six Flags did not demonstrate the "positive exercise of dominion over a public way or another's property [that] is necessary in order to

---

[6] As far as liability goes, the only issue we address herein is the existence and scope of the duty owed by Six Flags to Martin under the circumstances presented. The issue of whether such a duty — assuming its existence — was breached has not been contested on appeal, nor has the undisputed fact that Martin suffered grave injuries from the attack. Though Six Flags challenged the jury's finding of proximate cause on direct appeal, the Court of Appeals affirmed that finding, and we declined to grant certiorari on that issue. Accordingly, our conclusion that Six Flags did in fact owe a duty to Martin under these circumstances resolves the issue of its liability.

19

avoid 'imposing upon invitors an unknowable and impossible burden for maintaining an undefined circumference of properties.'" *Motel Properties v. Miller*, 263 Ga. 484, 486 (3) (436 SE2d 196) (1993) (citation and punctuation omitted).

> We have defined the term "approaches" as follows:
>
> [T]hat property directly contiguous, adjacent to, and touching those entryways to premises under the control of an owner or occupier of land, through which the owner or occupier, by express or implied invitation, has induced or led others to come upon his premises for any lawful purpose, and through which such owner or occupier could foresee a reasonable invitee would find it necessary or convenient to traverse while entering or exiting in the course of the business for which the invitation was extended.

*Motel Properties*, 263 Ga. at 486 (2). To be considered "contiguous, adjacent to, and touching," the property in question must be "within the last few steps taken by invitees, as opposed to 'mere pedestrians,' as they enter or exit the premises." Id. (citation and punctuation omitted).

Publicly owned property that falls within the above definition may constitute an approach over which a landowner owes some duty of care "within the confines of [its] right in the public way." *Todd v. F. W. Woolworth Co.*, 258 Ga. 194, 196 (1) (366 SE2d 674) (1988). Accord *Motel Properties*, 263 Ga. at 486. The scope of the area encompassed in an approach "necessarily depends

20

upon the circumstances of a particular case — i.e., what constitutes the 'last few steps' on foot is necessarily a lesser measure of proximity to the premises than the last few steps taken in the context of a faster-moving automobile." *Combs v. Atlanta Auto Auction*, 287 Ga. App. 9, 15 (4) (650 SE2d 709) (2007). In addition, property not otherwise comprising the approach to a landowner's premises may be deemed part of the premises and approaches where the landowner has taken affirmative steps, for its own particular benefit, to exercise control and dominion over the public way or the property of another. *Motel Properties*, 263 Ga. at 486 (citing *Elmore of Embry Hills v. Porcher*, 124 Ga. App. 418, 420 (183 SE2d 923) (1971)); *Scoggins v. Campbellton Plaza Corp.*, 114 Ga. App. 23, 26 (1) (150 SE2d 179) (1966) (ramp linking a grocery store's adjacent sidewalk with a parking lot, constructed at the request of the store owner, was part of store's premises and approaches).[7]

---

[7] The notion of "control and dominion" over property also arises in the context of determining when one who is not the owner of property attains the status of an "occupier" with the same duty under OCGA § 51-3-1 as the owner. The Court of Appeals has held that, for a duty to arise based on a theory of one's control over the property of another, "there must be the grant of authority, dominion or a continuing exclusive right to control the premises in question." *Housing Auth. of Atlanta v. Famble*, 170 Ga. App. 509, 522 (2) (b) (317 SE2d 853) (1984). Martin does not contend that Six Flags was an "occupier" with respect to the CCT bus stop, so this doctrine does not apply here.

In this case, the site of the physical attack on Martin was undisputedly a public bus stop, serving county-owned buses, situated on a public road — South Service Road — that itself is not adjacent to any property owned or operated by Six Flags. South Service Road dead-ends into another public road — Six Flags Parkway — that ultimately leads onto Six Flags property, approximately 200 feet from where South Service Road dead-ends. The bus stop is not contiguous with, adjacent to, or touching Six Flags property in any way. The CCT bus stop could be held to be within the approach to Six Flags, then, only upon a finding that Six Flags had taken affirmative steps, for its own particular benefit, to exercise control or dominion over the bus stop and the public way leading to it. Even viewed most favorably to Martin, the evidence simply does not support such a finding.

While the record clearly reflects that Six Flags undertook certain measures to control traffic, perform landscaping, pick up trash, and erect signage along the stretch of Six Flags Parkway leading into the park, these measures fall short of the level of control and dominion required to subsume this public road within Six Flags' approaches. The measures Six Flags employed along Six Flags Parkway were primarily targeted at beautification of the roadway and facilitation

22

of access to the park, but these measures were coterminous with Cobb County's performance of its own functions in this regard. See *Rischack v. City of Perry*, 223 Ga. App. 856, 858 (1) (479 SE2d 163) (1996) (grassy strip along sidewalk in front of hotel, owned by the City, was not part of hotel's approach, notwithstanding hotel's voluntary performance of routine aesthetic and maintenance work there). As one example, Cobb County police declined Six Flags' request to intervene with private vendors selling drinks and other items along Six Flags Parkway, clearly indicating that Six Flags did not enjoy dominion over the roadway to the extent Martin claims it did. While Six Flags did deploy off-duty Cobb County police officers at the park's closing time at two particular points along Six Flags Parkway that were considered "hot spots" for exiting patrons, the primary purpose for stationing officers there at those times was the control of vehicular and pedestrian traffic. That measure did not, therefore, constitute the assumption of any general duty to provide security along the roadway.

Moreover, even if some portion of Six Flags Parkway could be considered part of the approach to the park's premises, either because of its sheer proximity to the Six Flags property line or because of some affirmative acts taken by Six

23

Flags with respect to the roadway, the CCT bus stop itself is not situated on Six Flags Parkway. Notwithstanding the evidence presented by Martin reflecting the ways in which Six Flags treated the roadway as part of its premises, there is very little to support the conclusion that it treated the CCT bus stop as such. Though it is true that Six Flags promoted the use of public transportation, including the CCT bus, by its patrons and employees, such acts are a far cry from an exercise of dominion, and riders exiting the bus at that stop are able to access local businesses other than Six Flags from that stop. Notably, there was evidence that security officers patrolling Six Flags' parking lots were not authorized to intervene in security incidents they happened to witness occurring at the CCT bus stop in any way other than via radio. Perhaps most significant, the security dispatcher on duty the night of the attack testified that, when the report came in regarding the attack, he initially dispatched Six Flags security to respond; his supervisor, however, "called off" the dispatch and instructed him to call Cobb County police instead because the bus stop "wasn't our property."

In the end, the facts show that Six Flags did what any ordinary business owner may try to do — attempted to make the areas surrounding its facilities

24

more attractive and less congested.[8] While the off-duty police officers hired by Six Flags may have sometimes assisted Cobb County with security issues outside the park's gates, the evidence does not show the level of dominion and control required to render the company responsible for the safety of its patrons at and around the bus stop in the same way it is responsible within the confines of its premises and approaches. We thus reject the contention that this conduct suffices to extend Six Flags' duty of care to encompass the CCT bus stop, but nonetheless agree with the Court of Appeals that the jury could find that Six Flags breached its duty to exercise ordinary care in keeping its own premises safe and that its breach was the proximate cause of the injuries Martin sustained at the CCT bus stop.

## III.

Having affirmed Six Flags' liability, we now address the apportionment of damages. See OCGA § 51-12-33 (prescribing method of apportioning

---

[8] As we have noted before, however, "[u]ndertaking measures to protect patrons does not heighten the standard of care; and taking some measures does not ordinarily constitute evidence that further measures might be required." *Lau's Corp.*, 261 Ga. at 494-495.

25

damages in actions against more than one person according to percentage of fault of each tortfeasor).  As noted above, the jury assessed its verdict 92% to Six Flags and 2% to each of the four named defendants, all of whom had criminal convictions in connection with the attack on Martin.  Six Flags has argued throughout the proceedings that the jury should be entitled to apportion damages not just among the named defendants but also among other individuals who, though not named as defendants, were alleged to have been involved in the attack on Martin.  The trial court rejected Six Flags' request to allow apportionment among the non-parties, finding that, given the absence of a criminal conviction against any of these individuals, the evidence was insufficient to permit apportionment against them.

On appeal, the Court of Appeals concluded that the trial court had imposed too high an evidentiary burden for the inclusion of non-parties in the apportionment determination.  *Six Flags*, 335 Ga. App. at 365.  It then considered Martin's argument that Six Flags had failed to preserve this alleged error on appeal and held that Six Flags had preserved the issue, but only as to two individuals, both of whom (a) were the subject of trial testimony supporting their involvement in the attack and  (b) were specifically named by Six Flags in

26

its appellate filings as having been improperly excluded from consideration for apportionment. Id. at 364-365. After identifying this apportionment error, the Court of Appeals concluded that the jury's verdict was infirm in its entirety and ordered the judgment reversed and the case remanded for a new trial. Id. at 365. In granting certiorari, we asked the parties to address whether the Court of Appeals had erred in determining that the trial court's apportionment error would require a full retrial. Implicit in the framing of this question were the understandings (1) that the trial court did in fact commit error in declining Six Flags' request to submit to the jury the question of apportionment to non-parties and (2) that Six Flags had properly preserved the apportionment issue for appellate review, at least as to the two non-parties identified by the Court of Appeals. Having declined to grant certiorari on these preliminary issues, we do not belabor them here, and instead proceed to determine whether, given that the two non-parties — Ander Cowart and "Mr. Black" — must be added to the verdict form, a complete retrial is necessary, as opposed to a partial trial limited to apportionment.

Our analysis again begins with the text of the relevant statute. The apportionment statute provides in relevant part:

(a) Where an action is brought against one or more persons for injury to person or property and the plaintiff is to some degree responsible for the injury or damages claimed, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall determine the percentage of fault of the plaintiff and the judge shall reduce the amount of damages otherwise awarded to the plaintiff in proportion to his or her percentage of fault.

(b) Where an action is brought against more than one person for injury to person or property, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall after a reduction of damages pursuant to subsection (a) of this Code section, if any, apportion its award of damages among the persons who are liable according to the percentage of fault of each person. . . .

(c) In assessing percentages of fault, the trier of fact shall consider the fault of all persons or entities who contributed to the alleged injury or damages, regardless of whether the person or entity was, or could have been, named as a party to the suit.

. . .

OCGA § 51-12-33. "The statutory scheme is designed to apportion damages among 'all persons or entities who contributed to the alleged injury or damages' — even persons who are not and could not be made parties to the lawsuit." *Couch v. Red Roof Inns*, 291 Ga. 359, 362 (1) (729 SE2d 378) (2012). A person will be considered to have contributed to the alleged injury where that person is shown to have "breach[ed] . . . a legal duty in the nature of [a] tort that is owed for the protection of the plaintiff, the breach of which is a proximate cause

28

of his injury." *Zaldivar v. Prickett*, 297 Ga. 589, 595 (1) (774 SE2d 688) (2015).

The text of the apportionment statute does not prescribe a means of correcting a trial court's apportionment error. Our common law, however, adheres to certain general principles in the correction of trial errors that affect less than the whole of a judgment.

> [W]here a judgment is entire and indivisible, it can not be affirmed in part and reversed in part, but the whole must be set aside if there [is] reversible error therein. But where a judgment appealed from can be segregated, so that the correct portions can be separated from the erroneous, the court will not set aside the entire judgment, but only that portion which is erroneous.

*Chicago Bldg. & Mfg. Co. v. Butler*, 139 Ga. 816, 819 (1) (78 SE 244) (1913) (citations omitted); accord *Cowart v. Strickland*, 149 Ga. 397, 400 (1) (100 SE 447) (1919) ("an issue once adjudicated without error may remain closed, where the judgment is divisible"). This principle has been applied in a variety of circumstances. See, e.g., *Cowart*, 149 Ga. at 400 (affirming judgment as to plaintiff's claim for ejectment and ordering retrial only on plaintiff's claim for recovery of mesne profits from defendant's wrongful possession); *Butler*, 139 Ga. at 820-821 (affirming verdicts as to some defendants but reversing as to others); *Central R. & Banking Co. v. Raiford*, 82 Ga. 400, 405-406 (2) (9 SE

29

169) (1889) (ordering retrial only as to whether plaintiff was contributorily negligent); *Schriever v. Maddox*, 259 Ga. App. 558, 561 (578 SE2d 210) (2003) (error in jury instructions warranted retrial on damages only); *Petty v. Barrett*, 187 Ga. App. 83, 83 (369 SE2d 294) (1988) (error in admission of certain evidence required retrial only as to specific category of damages to which improper evidence related); *Clark v. Wright*, 137 Ga. App. 720, 722 (2) (224 SE2d 825) (1976) (inconsistency in verdicts between husband and wife plaintiffs warranted retrial only as to the proper measure of damages to be awarded husband). Limiting the scope of retrial to only those distinct portions of the judgment that are infirm serves the dual objectives of judicial economy and respect for the jury's verdict.

This general principle is readily adaptable to the apportionment context. The apportionment statute requires that, once liability has been established and the damages sustained by the plaintiff have been calculated, the trier of fact must then assess the relative fault of all those who contributed to the plaintiff's injury — including the plaintiff himself — and apportion the damages based on this assessment of relative fault. OCGA § 51-12-33 (a)-(c). In other words, the jury must take the total amount of damages sustained by the plaintiff, identify the

30

persons who are at fault, and award damages according to each person's percentage of fault. See *Zaldivar*, 297 Ga. at 593-596; *Couch*, 291 Ga. at 361. Thus, once liability has been established, the calculation of total damages sustained by the plaintiff is the first step, and the allocation of relative fault and award of damages according to that allocation is a distinct second step. There is no reason these two steps cannot be segregated for purposes of retrial.

Citing the statutory mandate that "the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall . . . apportion its award," OCGA § 51-12-33 (b), Six Flags contends, and the Court of Appeals agreed, that this language requires the damages calculation and the apportionment of fault be done at the same time and, therefore, precludes the segregation of these steps. We disagree with this construction of the quoted language, which is not demanded by the statutory text and coexists less comfortably with the common law regarding partial retrials, the general law of damages, and other subsections within the apportionment statute itself than a construction allowing segregation of apportionment for retrial purposes. First, we note that the natural presumption that a single factfinder will make the determination of liability, damages sustained, and apportionment upon the initial

31

trial in an apportionment case is no different than the presumption that a single factfinder will make liability and damages determinations in other contexts in which our courts have permitted retrial of less than the whole of the case. In addition, construing the statute as the Court of Appeals did necessarily implies that the damages calculation itself should somehow be affected by the identity or number of tortfeasors involved, which is contrary to the law regarding the determination of damages. See generally OCGA § 51-12-4 (damages are generally intended as compensation for injury). This construction is also at odds with the language of subsection (f) (1) of the apportionment statute, which provides that "[a]ssessments of percentages of fault of nonparties shall be used only in the determination of the percentage of fault of named parties"; in other words, non-parties' fault bears *only* on the relative fault of the named parties, and, therefore, does not bear on the assessment of liability itself or the damages determination. See OCGA § 51-12-33 (f) (1);[9] *Six Flags*, 335 Ga. App. at 368

---

[9] Closely related to subsection (f) (1) is subsection (f) (2), which provides that "[w]here fault is assessed against nonparties pursuant to this Code section, findings of fault shall not subject any nonparty to liability in any action or be introduced as evidence of liability in any action." Subsection (f) as a whole thus addresses two sides of the same coin; subsection (1) defines the impact of non-party fault in the case at hand, and subsection (2) defines its impact — or lack thereof — in other cases.

(Miller, J., concurring specially). In short, we reject the contention that the text of the statute requires a single trier of fact to make the determination of liability, damages sustained, and apportionment.

Six Flags also contends that our precedent regarding retrials in cases involving comparative negligence precludes any remedy other than a full retrial. We disagree. As Six Flags notes, we have said in the past that "where *comparative* negligence is an issue at trial, liability and damages are so 'inextricably joined' that a new trial on damages only is impermissible." *Head v. CSX Transp.*, 271 Ga. 670, 673 (4) (524 SE2d 215) (1999) (citing *Bridges Farms v. Blue*, 267 Ga. 505 (480 SE2d 598) (1997)) (emphasis supplied). Assuming without deciding that this categorical rule continues to apply in comparative negligence cases after enactment of the apportionment statute,[10] it

---

[10] The Tort Reform Act, which included the apportionment statute along with various other reforms to Georgia tort law, was enacted in 2005. See Ga. L. 2005, p. 1, § 12. We note that the apportionment statute did codify the existing law of comparative negligence. See OCGA § 51-12-33 (g) (plaintiff not entitled to recovery of any damages if he is 50 percent or more responsible for injury or damages); see also *Zaldivar*, 297 Ga. at 593-594 (recognizing that apportionment statute codified existing law of comparative negligence). Whether the holding in *Head* and *Bridges Farms* survives the enactment of the apportionment statute is an issue we need not decide here, where comparative negligence is not at issue. But see *Six Flags*, 335 Ga. App. at 368 (Miller, J., concurring specially) (concluding that this rule did not survive enactment of the apportionment statute).

does not demand a particular result here in any event. Unlike the assessment of the plaintiff's relative fault — which, if greater than or equal to 50 percent of total fault, will preclude the plaintiff's recovery altogether, see OCGA § 51-12-33 (g) — the assessment of fault among tortfeasors will in most if not all cases have no impact on the jury's finding of liability or on the total amount of damages to which the plaintiff is entitled. Accordingly, relative fault among tortfeasors will not in all cases be "inextricably joined" with the issues of liability and damages so as to preclude a retrial on apportionment only.

In sum, and as a general matter, where correction of an apportionment error involves only the identification of tortfeasors and assessment of relative shares of fault among them, there is no sound reason to disturb the jury's findings on liability or its calculation of damages sustained by the plaintiff.[11] Though there may be instances in which the particular circumstances of the case

---

[11] This view finds support from other jurisdictions with similar apportionment schemes. See, e.g., *Schelbauer v. Butler Mfg. Co.*, 673 P2d 743, 752 (Cal. 1984) (where error below related only to apportionment, finding "no reason to subject the parties and the courts to the expense and delay of retrial of [other] issues"); *HealthONE v. Rodriguez*, 50 P3d 879, 890-891 (Colo. 2002) (trial court may retry case on apportionment only, where liability was properly resolved at first trial); *Regions Bank v. Capital Square, Inc.*, 83 So3d 900, 902-903 (Fla. Dist. Ct. App. 2012) (reversing due to trial court's erroneous refusal to instruct jury regarding apportionment to non-parties and remanding for retrial only on apportionment).

or the nature of the apportionment error militate otherwise, in the ordinary case, the issue of apportionment among tortfeasors will be sufficiently distinct from the issue of liability and calculation of damages that the correction of an error in apportionment will not require a full retrial.[12]  In fact, where the issue of apportionment is distinct from the issues of liability and damages sustained, our "law of the case" doctrine will in most instances **preclude** the re-litigation of these issues once the jury's verdict on them has been affirmed.  See OCGA § 9-11-60 (h) (rulings by appellate court "shall be binding in all subsequent proceedings in that case"); *Six Flags*, 335 Ga. App. at 369 & n.65 (Miller, J., concurring specially) (law of the case doctrine would bar re-litigation of liability on retrial).

This case, we conclude, falls within the realm of the ordinary case in which liability and the calculation of damages sustained are distinct from the apportionment of fault.  The existence and degree of responsibility of alleged tortfeasors not appearing on the verdict form are issues that are entirely separate

---

[12] To the extent that *Double View Ventures* can be construed as adopting a categorical rule requiring a full retrial as the result of any apportionment error — a reading we do not necessarily adopt, given the absence of any analysis of the issue in the opinion — it is overruled as to this issue.  See *Double View Ventures*, 326 Ga. App. at 561.

35

from the questions of whether Six Flags and the other defendants breached their respective duties to Martin and whether those breaches proximately caused Martin's injuries. The relative fault of those individuals likewise would have no effect on the total amount of damages Martin has sustained as a result of the injuries he suffered in the attack. We thus conclude that the apportionment error here requires a retrial only as to apportionment, and we reverse the judgment of the Court of Appeals to the extent it ordered this case be retried in its entirety.[13]

Judgment affirmed in part and reversed in part, and case remanded with direction. Hines, C. J., Melton, P. J., Benham, Hunstein, Nahmias, Blackwell, and Peterson, JJ., and Judge Bemon G. McBride III concur. Boggs, J., disqualified.

Decided June 5, 2017.

Certiorari to the Court of Appeals of Georgia — 335 Ga. App. 350.

---

[13] We acknowledge that a retrial on apportionment may require the presentation of much (if not all) of the same evidence as was presented at the first trial on the question of liability. That the issues of liability and apportionment are distinct does not mean that the proof relevant to those issues is substantially different. The scope of evidence to be presented on retrial is, of course, an issue to be addressed in the trial court.

Deitch & Rogers, Gilbert H. Deitch, Andrew T. Rogers; Bondurant, Mixson & Elmore, Naveen Ramachandrappa, Michael B. Terry, Benjamin W. Thorpe; The Law Offices of Michael Lawson Neff, Michael L. Neff, T. Shane Peagler, for appellant.

Holland & Knight, Laurie W. Daniel; Vernon M. Strickland, for appellees.

Hawkins Parnell Thackston & Young, Martin A. Levinson; Drew Eckl & Farnham, Garret W. Meader; Bryan Cave, William V. Custer IV, Julia L. Fenwick, amici curiae.