NOT DESIGNATED FOR PUBLICATION

No. 118,698

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEFFREY ALAN HAMMOND,
*Appellant*,

v.

SAN LO LEYTE VFW POST #7515,
*Appellee*.

MEMORANDUM OPINION

Appeal from Cloud District Court; KIM W. CUDNEY, judge. Opinion filed September 28, 2018. Reversed and remanded with directions.

*Larry G. Michel* and *Klint A. Spiller*, of Kennedy Berkley Yarnevich & Williamson, Chartered, of Salina, for appellant.

*Michelle R. Stewart*, of Hinkle Law Firm LLC, of Overland Park, for appellee.

Before MALONE, P.J., MCANANY and POWELL, JJ.

PER CURIAM: This litigation arose out of an altercation outside the San Lo Leyte VFW Post #7515 (VFW) facility in Clyde. Jeffrey Alan Hammond brought this action against the VFW and Travis Blackwood to recover for personal injuries arising from the incident.

Hammond settled his claims against Blackwood. The VFW moved for summary judgment, arguing that it owed no duty to Hammond because the altercation was outside of the VFW facility. Hammond responded that an exception to the general rule of no duty

1

applies when, as here, the proprietor had reason to anticipate that Hammond might be in danger and had the duty to take reasonable care to prevent the harm. The district court rejected Hammond's argument and granted summary judgment, concluding as a matter of law that (1) the VFW owed no duty to Hammond based on the uncontroverted fact that the altercation occurred off of the VFW's property, and (2) the VFW owed no duty to protect Hammond from the criminal acts of third parties.

On appeal, we are confronted with factual circumstances which our Supreme Court has not yet had the opportunity to address that affect the nature and scope of the duty of a tavern owner to one of its patrons. Our analysis leads us to conclude that, under the facts of this particular case, the VFW is not entitled to judgment as a matter of law based on the proposition that it owed no duty to Hammond, and there remain genuine issues of material fact that preclude summary judgment. Accordingly, we reverse and remand for further proceedings.

In an appeal from the district court's ruling on a summary judgment motion, we consider the motion de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).  In doing so, we apply the same standards found in K.S.A. 60-256(c)(2) which the district court was required to apply. *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011).

Here, the VFW has the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. In considering the VFW's motion, we resolve all facts and inferences which may reasonably be drawn from the evidence in favor of Hammond, the party against whom the summary judgment motion was sought. We must deny the motion if reasonable minds could differ as to the conclusions to be drawn from the evidence. See *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

2

Pursuant to Supreme Court Rule 141 (2018 Kan. S. Ct. R. 205), the VFW included in its motion a statement of the uncontroverted facts upon which it relies for the purpose of its motion for summary judgment. In his response, Hammond asserts additional facts. Here are the combined uncontroverted facts upon which the parties rely for their respective positions:

1. At approximately 10 p.m. on February 20, 2016, Plaintiff Jeffrey Alan Hammond, a resident of Lee's Summit, Missouri, visiting Clyde, Kansas, went with his wife to the Clyde VFW.

2. While at the VFW, Hammond went to the restrooms located in the rear of the club, where he encountered Travis Blackwood.

3. Hammond and Blackwood had a verbal argument in the bathroom, and according to Hammond, Blackwood wanted to beat him up in the bathroom but Hammond left the bathroom so that anything that occurred would be in public view. Hammond does not concede that he "in any way caused or was a willing participant" in the argument.

4. Neither Blackwood nor any of his friends laid hands on Hammond inside the VFW.

5. After he left the bathroom, Hammond returned to his table at the club to finish his beer.

6. After he finished his beer, Hammond walked up to the bar and ordered another beer.

7. While he was at the bar, the VFW club manager, James Nease, approached Hammond from the back of the bar where Nease had been standing with Blackwood.

8. When Nease reached Hammond, Nease told Hammond to leave the bar.

9. Nease told Hammond he was barred from the Clyde club for life. Hammond responded, "What are you talking about? I've only been here less than 20 minutes." Nease responded that Hammond had been arguing with customers. At this point, Hammond said, "This is bullshit. . . . This is B.S." Blackwood and his companions crowded behind Nease and began to help the manager escort Hammond outside.

10. Before Nease approached Hammond to banish him from the club, Hammond observed Blackwood and his companions communicate with Nease. Blackwood and his companions followed Nease as Nease approached Hammond. Shari Hammond overheard one of them say, "'Your husband's about to get kicked out of here.'" Blackwood and his companions crowded around behind Nease as Nease announced Hammond's banishment from the VFW. Blackwood and his companions celebrated Nease's announcement of Hammond's banishment, as Hammond heard one of them say, "'Yeah, he's out of here. He's out of here.'" Hammond agreed to leave, and Nease pushed him out the door of the club. Blackwood and his companions also moved toward the door. They moved closely behind Nease and helped escort Hammond outside the VFW.

4

11. Once outside of the bathroom, and until Nease and Blackwood and his companions escorted Hammond out of the club, Blackwood made no attempt to hit Hammond while Hammond was in the VFW.

12. According to Hammond, Hammond, Nease, Hammond's wife, Blackwood, and several of Blackwood's friends exited the club.

13. According to Hammond, Blackwood and his friends surrounded him and said something like, "'You're a mouthy son of a bitch.'"

14. Hammond testified that his wife, Shari Hammond, then came out and pushed Blackwood back and said, "'You two need to f'n grow up.'"

15. Shari Hammond testified that while the manager, Nease, was still outside, she saw Blackwood push her husband against the wall. In response, she pushed Blackwood and then someone pulled her off. According to Shari Hammond, they all got pulled apart and separated. At that point, Shari followed the manager inside because "it seemed like it had calmed down."

16. According to Hammond's testimony, Shari Hammond and Nease then went back inside the VFW.

17. Shari Hammond did not see anyone strike her husband.

18. After Hammond's wife and Nease went back inside the VFW, and while on the sidewalk in front of the VFW, Hammond testified Blackwood head-butted him, pushing him against the wall so that his head hit the wall.

19. Hammond made his way to his truck parked in the street in front of the VFW, and Blackwood and his friend started kicking him.

20. After kicking Hammond in the street, Blackwood and his friend went back inside the VFW.

21. When Hammond's wife went back inside the VFW, she started talking with some of the girls who had gone outside with the group and about 5 to 10 minutes later, "'one of the guys comes up to [her] and says "Your husband's laying [*sic*] in the middle of the street."'"

22. Hammond's wife went outside and investigated, saw her husband was bloody, and then called 911.

23. Prior to February 20, 2016, Blackwood had only been involved in one physical altercation at the VFW which occurred in 2013. Blackwood instigated that fight. That assault occurred on January 31, 2013 after Bradley Czapanskiy arm wrestled Travis Blackwood's brother, Cody Blackwood. During their arm wrestling match, Czapanskiy's and Cody Blackwood's arms ended up falling off the edge of the table causing them both to stand up. At that point, Czapanskiy's mother, Deborah Czapanskiy, witnessed Travis Blackwood run across the room and "'blindside'" Bradley Czapanskiy with a punch, dropping Czapanskiy to the floor. After Bradley Czapanskiy was on the floor, Travis Blackwood and his two brothers proceeded to kick Czapanskiy, who was lying on the ground curled up in a ball. At no point did the staff of the VFW attempt to help the Czapanskiys during the assault, according to the Czapanskiys.

6

24. Blackwood was banned from the VFW for a period of 90 days following the incident in 2013. James Nease was generally aware of the incident involving Blackwood in 2013 but had never observed Blackwood behave in a physically aggressive manner in the VFW since Nease began working there in late 2014.

Hammond argues that the VFW is not entitled to summary judgment, because under the circumstances the VFW had a duty to protect him from Blackwood's assault and there is a genuine issue of material fact as to whether the VFW carried out that duty. On the other hand, the VFW contends that the fight occurred on a public sidewalk and not on the VFW's property. Moreover, because Hammond's injury was the result of an assault by a third party, the VFW argues that it had no responsibility for such third-party criminal conduct. Thus, it concludes that the VFW owed no duty to Hammond and it is entitled to summary judgment.

In actions based on claims of negligence, summary judgment should be granted with caution. *Apodaca v. Willmore*, 306 Kan. 103, 106, 392 P.3d 529 (2017); *Fettke v. City of Wichita*, 264 Kan. 629, 632, 957 P.2d 409 (1998). To show negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. A plaintiff must establish the existence of a legal duty as part of a prima facie case of negligence. *South v. McCarter*, 280 Kan. 85, 94, 119 P.3d 1 (2005).

Whether a duty exists is a question of law over which our review is unlimited. *Sall v. T's, Inc.*, 281 Kan. 1355, 1360, 136 P.3d 471 (2006). Whether a duty has been breached is a question of fact. *South*, 280 Kan. at 94. Summary judgment in a negligence action is generally proper only if the questions presented are questions of law. *Martin*, 297 Kan. at 245. If a court concludes that a defendant accused of negligence did not have a duty to act in a certain manner toward the plaintiff, then a court may grant summary

7

judgment because the existence of a duty is a question of law. *Elstun v. Spangles*, 289 Kan. 754, 757, 217 P.3d 450 (2009).

Kansas has adopted Restatement (Second) of Torts § 344 (1965), which defines the scope of liability of owner/operators of commercial enterprises:

> "A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
> > "(a) discover that such acts are being done or are likely to be done, or
> > "(b) give a warning adequate to enable the visitors to avoid the harm, or
> otherwise to protect them against it."

The VFW cites a number of Kansas cases which consider the duty of a bar proprietor with respect to incidents that occur on the premises. It also cites *Coleman v. Logan*, No. 98,099, 2008 WL 2571814 (Kan. App. 2008), as support for the converse— that the duty does not extend to off-premises incidents.

In *Coleman*, this court considered whether a live music venue had the duty to provide security on the public sidewalk in front of the theater where a shooting occurred after the performance had concluded. Our court found that no duty was owed.

There are a number of facts in *Coleman* that distinguish it from those before us in our present case. In *Coleman*, one of the plaintiffs had been involved in at least two altercations that evening. But there is no indication that either occurred in the theater before the shooting out on the sidewalk or that any member of the defendant's management or its security team was aware of the altercations. Further, there is no

indication that the person who ultimately shot the plaintiffs had been involved in any disruptive incident inside the theater before the shooting.

Moreover, the issue in *Coleman* centered on the common law duty, under Restatement (Second) of Torts § 324A (1965), for "[o]ne who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person." This was based on the fact that the defendant had contracted with the event promoter to provide security at all theater exits. The court found that the security contracted for ended at the exit doors of the theater.

In *Gould v. Taco Bell*, 239 Kan. 564, 722 P.2d 511 (1970), the court provided a summary of Kansas law relating to the liability of restaurant and bar owners for fights on their premises. In *Gould* the fight was in a restaurant. The court cited *Gerchberg v. Loney*, 223 Kan. 446, 449, 576 P.2d 593 (1978), for the proposition that the possessor of property on which an invitee enters owes a duty of ordinary care for its invitee's safety: "This duty is active and positive. It includes a duty to protect and warn an invitee against any danger that may be reasonably anticipated." With respect to bar fights, the *Gould* court explained:

> "In *Kimple v. Foster*, 205 Kan. 415, 469 P.2d 281 (1970), we discussed the liability of a business owner for an intentional, harmful assault upon a patron by another patron and set for the general rule as follows:
> 'A proprietor of an inn, tavern, restaurant or like business is liable for an assault upon a guest or patron by another guest or third party where the proprietor has reason to anticipate such an assault and fails to exercise reasonable care to forestall or prevent the same.' Syl. ¶ 2.
> 'The duty of a proprietor of a tavern or inn to protect his patrons from injury does not arise until the impending danger becomes apparent to him, or the circumstances are

9

such that a careful and prudent person would be put on notice of the potential danger.' Syl. ¶ 3.

"This rule is consistent with that set forth in Restatement (Second) of Torts § 344 (1963)." *Gould*, 239 Kan. at 567-68.

In both *Gould* and *Kimple* the altercation took place on the proprietor's premises and the governing law was cited with that in mind. The question for us is whether, under the particular facts of our case, the same duty is imposed on a tavern proprietor who has reason to anticipate an assault is likely to occur immediately upon a patron leaving the premises at the insistence of the tavern proprietor. The matter in dispute at this stage of the proceedings in our present case is the existence of a duty. We have found no case in which the existence of a duty and the breach of that duty in location A is negated by the fact that the resulting harm from the breach occurred in location B. Quite to the contrary, instances are legion—in professional malpractice cases or in design defect cases, for example—in which the effects of the breach of a duty are removed in time and place from the negligence that caused the injury to the plaintiff. This remoteness in time and place certainly can affect the foreseeability of harm, but as we will see that is a matter for the fact-finder to resolve at trial, not at this summary judgment stage.

In *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993), the plaintiff was a student whom the university assigned to a dorm where she was sexually assaulted by another dorm resident who recently had been charged with raping another student, a fact which was known to the university when it assigned the plaintiff to that dorm. The court ruled that as the plaintiff's landlord, the university, "owes a duty of reasonable care to its tenants." 253 Kan. at 583. The court cited the foregoing language from *Gould* with approval and observed that prior similar acts committed upon invitees by third parties furnish actual or constructive notice to a proprietor. *Nero*, 253 Kan. at 584. The court cited *Kansas State Bank & Trust Co. v. Specialized Transportation*

10

*Services, Inc.*, 249 Kan. 348, 362, 819 P.2d 587 (1991), for the proposition that "'[w]hether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact. Only when reasonable persons could arrive at but one conclusion may the court determine the question as a matter of law. [Citation omitted.]" *Nero*, 253 Kan. at 583.

In *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1045, 934 P.2d 121 (1997), the Supreme Court affirmed the granting of summary judgment in favor of the university on the plaintiff's wrongful death and survivor actions brought as a result of Gragg being shot by Scott at a fireworks display held on the university's campus. The court explored the relationship between the university and the sponsors of the fireworks show and cited various Restatement provisions as well as the holdings in *Nero* and in *Seibert v. Vic Regnier Builders, Inc.*, 253 Kan. 540, 548, 856 P.2d 1332 (1993), which we will discuss shortly. The *Nero* court stated that "a special relationship or specific duty has been found if one creates a foreseeable peril, not readily discoverable, and fails to warn." 253 Kan. 567, Syl. ¶ 3. Nevertheless, the *Gragg* court concluded that no special relationship existed under the facts of that case which required the university "to protect Gragg from the unanticipated and unexpected attack by Scott." *Gragg*, 261 Kan. at 1057.

In *Seibert*, 253 Kan. at 548, the patron of a shopping center was shot by an unknown assailant in the shopping center's parking lot. On appeal, the court stated:

> "The owner of a business is not the insurer of the safety of its patrons or customers. The owner ordinarily has no liability for injuries inflicted upon patrons or customers by the criminal acts of third parties in the business' parking lot, as the owner has no duty to provide security. Such a duty may arise, however, where circumstances exist from which the owner could reasonably foresee that its customers have a risk of peril above and beyond the ordinary and that appropriate security measures should be taken." 253 Kan. at 548.

11

The court reversed summary judgment in order for the fact-finder at trial to determine from the totality of the evidence whether the risk of harm was foreseeable so as to impose a duty on the shopping center to protect its patrons through the use of security measures in the parking lot. Once again, the injury occurred on the shopping center premises, and the court had no occasion to consider the duty of a business proprietor for arguably foreseeable adverse consequences to a business patron upon leaving the premises.

Hammond cites *Havel v. Asbury-Salina Regional Medical Center, Inc.*, No. 66,006, 1991 Kan. App. LEXIS 720 (1991) (unpublished opinion), in which the plaintiff, who had been visiting a patient at the hospital, was assaulted in the hospital's parking lot by a third party, Valdez, as she attempted to leave. Citing *Gould*, the court concluded that Valdez' actions preceding his attack on the plaintiff were sufficient to put the hospital on notice "to enable the possessor of property to act on behalf of the invitee's safety." 1991 Kan. App. LEXIS 720, at *3. But here again, the attack took place on the defendant's premises, and the court did not consider the duty of a business proprietor for arguably foreseeable adverse consequences to a visitor upon leaving the business premises.

The final case raised by the parties is *Legleiter v. Gottschalk*, 32 Kan. App. 2d 910, 913, 91 P.3d 1246 (2004). There, Hamby was at the bar with his friends, who included Legleiter and Lynn. Hamby had been playing pool and was starting a new game when Gribben, the bar manager, told him the bar was closing and he would have to end the game and leave. Hamby ignored Gribben and started a new game. An argument ensued between Hamby and Gribben, and Gribben physically removed Hamby from the bar.

As Gribben forcefully ejected Hamby from the bar, a number of bar patrons followed outside to see what would happen. Once outside, as Hamby continued to

struggle with Gribben, one of the bystanders came to Gribben's assistance. Eventually, a general melee ensued after Hamby's friend Lynn retrieved a baseball bat from his car and used it to strike the bystander helping Gribben. In the course of the brawl, Hamby's friend, Legleiter, struck Karst, one of the bystanders, on the head. In turn, Karst repeatedly struck Legleiter, knocked him down, and then kicked him until Legleiter lost consciousness. When this happened Gribben, the bar manager, had already returned to the bar.

Legleiter sued Gottschalk, the owner of the bar. He argued that the bar had a duty to protect him against the criminal acts of third parties. The district court disagreed and granted summary judgment in favor of Gottschalk because Legleiter was injured on public property which was not possessed or controlled by the bar. Further, the bar had no duty to protect Legleiter from the acts of third parties. Our court affirmed, concluding:

> "This is . . . not a situation where Gribben was creating a known, obvious, and imminently dangerous situation or was subjecting any bar patrons, except Hamby who he was forcefully ejecting from the bar, to such a situation. This is not a situation where the fight injuring Legleiter broke out on the business premises and then moved to the public street or thoroughfare." 32 Kan. App. 2d at 918.

There are a number of facts that distinguish *Legleiter* from our present case. In *Legleiter*, the assailant was a bystander. During the melee, the plaintiff struck Karst first. There had been no confrontation between the plaintiff and Karst, his assailant, while they were in the bar before the fight ensued. The disagreement that led to Hamby being ejected from the tavern was between Hamby and the tavern manager. The bystanders who came out of the tavern as Hamby was ejected were there as onlookers, not for the purpose of harassing and eventually assaulting the plaintiff. This included Karst. The tavern

13

proprietor in *Legleiter* could not have anticipated that Karst would join in the melee and assault the plaintiff.

In the present posture of Hammond's case, we view the uncontroverted facts and all reasonable inferences that can be drawn from the facts in the light favoring Hammond. *Armstrong*, 305 Kan. at 24. Viewed in that light, there is evidence before us that the initial confrontation took place in the bar between Hammond and Blackwood less than 20 minutes after Hammond and his wife arrived at the bar. The confrontation took place in the bathroom. The uncontroverted facts do not establish that Hammond was a willing participant in the confrontation. Blackwood wanted to beat up Hammond in the bathroom, so Hammond left so that anything that happened would be in public view.

Blackwood was instrumental in having Hammond ejected from the bar. Nease ejected Hammond based solely on the word of Blackwood. Hammond was not given the opportunity to explain what transpired between him and Blackwood. Nease was aware of Blackwood's propensity for violence in the past. Hammond was not. Blackwood was supported by a number of friends in the bar who reveled in Hammond being ejected.

We do not have any facts regarding the organizational structure of the Clyde VFW, other than the fact that the VFW refers to itself as a club in its statement of uncontroverted facts. Hammond and his wife were visitors from Missouri. But we infer that Blackwood and his friends at the bar were club members and subject to whatever rules and regulations controlled the operation of the club and the conduct of its members. Thus, Nease had the power to exercise some control over Blackwood his friends at the bar through the power to ban unruly patrons or patrons that disregarded his directions as surrogate for the proprietor. A prior bar manager had exercised that power with Blackwood, and Nease was exercising it now with Hammond, a club visitor.

14

When Nease escorted Hammond out of the bar, Nease was accompanied by Blackwood and his friends. Nease made no effort to restrain Blackwood and his friends from leaving as he ejected Hammond. Viewed in the light favoring Hammond, the assault by Blackwood and his friends was entirely predictable and could have been avoided by Nease allowing Hammond and his wife to leave on their own.

*Gould* teaches us that a proprietor such as the VFW "'is liable for an assault upon a guest or patron by another guest or third party where the proprietor has reason to anticipate such an assault and fails to exercise reasonable care to forestall or prevent the same.'" 239 Kan. at 567. *Gould* also teaches us that this duty upon a proprietor arises when "the impending danger becomes apparent to him, or the circumstances are such that a careful and prudent person would be put on notice of the potential danger." 239 Kan. 564, Syl. ¶ 3.

While the tortious conduct is consummated when the foreseeable conduct results in actual harm to the plaintiff, in the circumstances of our present case negligence can arise—based on the existence of a duty and the breach of that duty—while all the parties were still on the VFW's premises. It was there that Nease arguably could have foreseen the consequences of allowing Blackwood and his friends to join him in escorting Hammond from the premises. Under this scenario, if established at trial, any breach of Nease's duty would have occurred before Nease stepped over the threshold of the tavern door.

While our Kansas courts have not had the opportunity to consider the duty of a tavern keeper in this context, the courts in Illinois have. In *Shortall v. Hawkeye's Bar & Grill*, 283 Ill. App. 3d 439, 670 N.E.2d 768 (1996), the court determined that the tavern owner owed a duty to protect the plaintiff from injuries sustained in a fight that took place immediately outside the tavern on the public sidewalk and street after the plaintiff

15

had left the tavern. The court explained that "tavern owners may not avoid application of the duty to act to protect invitees from criminal attack by third parties simply because the disturbance giving rise to the duty occurs just out the front door, especially where the owner contributes to the altercation by sending patrons out into it." 283 Ill. App. 3d at 444.

In *Osborne v. Stages Music Hall, Inc.*, 312 Ill. App. 3d 141, 145, 726 N.E.2d 728 (2000), the patron of a nightclub was attacked by another patron on the public sidewalk in front of the club. The court found the location of the attack to be irrelevant when the attacker's actions were reasonably foreseeable. The court noted that there was evidence that the club bouncers knew that the men outside were drunk and angry, but the bouncers did nothing after locking the men outside. The court stated that "the bouncers exported the club's problems to the sidewalk and then ignored the troublemakers while allowing two female patrons to leave through locked doors into the path of potentially dangerous men." 312 Ill. App. 3d at 149. Under these circumstances, the court found it was reasonably foreseeable that a patron could be attacked after exiting the club, and the club had a duty to protect its patrons from such an occurrence.

In *Haupt v. Sharkey*, 358 Ill. App. 3d 212, 218, 832 N.E.2d 198 (2005), the court reversed summary judgment in favor of the tavern owner. There, the plaintiff's assailant, a member of a biker gang who had been banned from several bars in town, shoved the plaintiff and was ejected from the bar. As the plaintiff was leaving the tavern, his assailant was waiting for him and struck the plaintiff in the face as soon as the door to the tavern closed behind him. The attack was outside the perimeter of the tavern's property. The court stated:

> "Although the general rule . . . is that a tavern owner has no duty to protect persons from foreseeable dangers caused by third persons off the premises controlled or

16

owned by the tavern owner, based on the holdings in *Osborne* and *Shortall,* we conclude that there is no bright line rule that a tavern owner's duty to protect its patrons from criminal acts of third parties absolutely ends at the precise property line of the tavern.

   "In fact, the courts . . . recognized authority establishing that an owner or operator of premises has a duty to provide a reasonably safe means of ingress and egress both on his premises and, within limitations dictated by the facts of the case, beyond the precise boundaries of such premises. [Citations omitted.]" 358 Ill. App. 3d at 218.

In *Wisz v. C&D Waterfall, Inc.*, No. 2-15-0300, 2015 WL 9594291 (Ill. App. 2005) (unpublished opinion), liability was not imposed. Foreseeability was the key. There was no evidence that the assailant was "verbally or physically aggressive toward plaintiff or any other patron" that night. Further, there was nothing to indicate that the assailant "had a history of violence or belligerence towards patrons such that defendant should have known that [the assailant] was a danger to other patrons." 2015 WL 9594291, at *7.

We find the Illinois approach to be entirely reasonable. Under any circumstance the tavern proprietor is not an insurer of safety of its patrons. Nor does this approach extend the duty, either geographically or temporally, beyond what was reasonably foreseeable upon the plaintiff's departure from the tavern.

Here, Blackwood had a history of violence in the bar. There had been a heated confrontation between Blackwood and Hammond that day, or at least by Blackwood against Hammond, and Nease was aware of it. When Nease escorted Hammond out of the bar, it was apparent to him that Blackwood and his friends were following. It doesn't take a genius to surmise that they did not accompany Nease so that they could wish Hammond "Bon Voyage." In any event, the reasonable foreseeability of harm to Hammond is a question of fact to be resolved by a jury. See *Nero*, 253 Kan. at 585. The *Nero* court stated further that "[a] special relationship or specific duty has been found if one creates a foreseeable peril, not readily discoverable, and fails to warn." 253 Kan. 567, Syl. ¶ 3.

17

Nease knew of Blackwood's past propensity to violence. Hammond did not. It would have required little of Nease to send Hammond and his wife on their way and hold Blackwood and his friends back to allow the Hammonds time to get to their vehicle and drive off. Blackwood and his friends apparently were VFW members subject to the house rules at the VFW's bar. Nease's predecessor had exercised authority over Blackwood in the past by banning him from the bar for 90 days for misconduct. Nease easily could have exercised the threat of similar action to prevent Blackwood and his friends from following Hammond outside and turning an exchange of words into violence.

The altercation occurred mere steps from the front door of the bar. Nease's duty to allow the Hammonds to safely leave would have arisen not outside the bar, but in the bar itself at the time he decided to eject Hammond. The breach of that duty also would have occurred inside the bar, though the consequences of that breach would not be realized until after Hammond stepped outside.

Citing a much earlier Illinois case, *Badillo v. DeVivo*, 161 Ill. App. 3d 596, 515 N.E.2d 681 (1987), the VFW argues that applying the more recent Illinois rule to the present facts would create intolerable burdens for tavern owners to "police the streets so as to ensure their patrons' safe passage to their cars or even their homes. . . . [I]t would require establishment owners to determine which party was the aggressor in an altercation and to detain that potentially dangerous person on the premises until the victim could flee." 161 Ill. App. 3d at 684. Of course, the more modern Illinois rule would do no such thing under the facts before us. Application of the Illinois rule would simply have given Hammond a head start, which is all that one could expect. Further, Nease did not have to engage in any hand-wringing over who was at fault. Here, the local VFW member got to stay and the out-of-towner from Missouri had to leave.

18

Under the facts presented in this appeal, if the violence that followed Hammond being ejected was reasonably foreseeable, Nease and the VFW had the rather innocuous duty while all the parties were still in the bar to simply give Hammond a head start. Accordingly, summary judgment was improvidently granted and this matter should go to the jury.

Reversed and remanded for further proceedings.