**SECOND DIVISION
MILLER, P. J.,
MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**November 1, 2024**

# In the Court of Appeals of Georgia

A24A0657. FORD MOTOR COMPANY v. HILL et al.;
A24A0658. STATE OF GEORGIA v. FORD MOTOR COMPANY et al.;
A24A0659. THOMAS et al v. HILL et al.

MILLER, Presiding Judge.

These related appeals arise from a tragic automobile accident wherein Melvin Hill and his passenger, Voncile Hill, both perished after Melvin's Ford truck went out of control and rolled over. Kim Hill and Adam Hill, as Melvin and Voncile's surviving children and co-executors of their estates (the "Plaintiffs"), filed this product liability action against Ford Motor Company ("Ford") and others.[1] The first trial in this case

---

[1] This is a renewal action. In the original action, the Plaintiffs sued Ford, The Pep Boys-Manny, Moe & Jack (Inc.) ("Pep Boys"), Curtis Clinton Thompson Jr., Willie Braswell, Donald Taylor, and Cooper Tire & Rubber Co. In this action, the Plaintiffs sued those parties except for Cooper Tire & Rubber Co. Ford is the only defendant that is a party to these appeals.

ended in a mistrial after the trial court found that Ford deliberately violated several orders in limine. As sanctions, the trial court declared that several facts were established as a matter of law and required Ford and its attorneys to pay jury costs. After a second trial, a jury awarded the Plaintiffs over $24 million in compensatory damages and $1.7 billion in punitive damages.

In Case No. A24A0657, Ford appeals the trial court's sanctions order, many of the trial court's evidentiary rulings, and the jury's award of punitive damages. We first conclude that the trial court correctly found that Ford violated an order in limine preventing their expert witness from opining on the Hills' cause of death, but the trial court erred in finding that Ford had violated two other orders. We are also compelled to conclude that the trial court was not authorized in these circumstances to sanction Ford by imposing issue preclusion sanctions, and we must reluctantly vacate the jury's verdict and the resultant judgment and remand for a new trial. Additionally, we reverse the trial court's order preventing Ford from presenting evidence that the Hills were improperly wearing their seat belts, and we vacate the trial court's order preventing Ford from introducing two scientific studies on the relationship between rollover injuries and roof deformation and remand for the trial court to consider the evidence under the proper standard.

In Case No. A24A0658, the State of Georgia appeals the denial of its motion to intervene as a judgment creditor. Because we vacate the jury's verdict and the resultant money judgment, we dismiss the State's appeal as moot. Finally, in Case No. A24A0659, Ford's attorneys from the first trial appeal the sanctions order insofar as the trial court sanctioned them personally. We affirm the trial court's order sanctioning Alan Thomas for his conduct during the first trial, but we reverse the trial court's order to the extent that it sanctioned Ford's other attorneys because the trial court did not find that they committed any sanctionable conduct.[2]

I. Facts and procedural history

a. The accident and the first trial

On April 3, 2014, Melvin Hill was driving his 2002 Ford F-250 Crew Cab "Super Duty" when it rolled over, killing him and his passenger, Voncile. In July 2016, the Plaintiffs filed this renewal action against Ford and others in the State Court of Gwinnett County, asserting claims for product liability and punitive damages. Before the first trial, the trial court granted several of the Plaintiffs' motions in limine, which

---

[2] We thank the American Tort Reform Association, the Chamber of Commerce of the United States of America, the Georgia Chamber of Commerce, Inc., Georgians for Lawsuit Reform, and the Alliance for Automotive Innovation for their helpful amicus briefs.

3

excluded: (1) any testimony from Ford's expert witness, Dr. Thomas McNish, relating to the cause of death of either decedent (the "McNish Order"); (2) evidence or reference to the Hills' allegedly improper seatbelt use (the "Seatbelt Order"); and (3) argument or suggestion of driver fault or driver error on the part of Melvin Hill (the "Driver Fault Order"). Before opening arguments, the trial court warned the parties that attempting to obtain a mistrial by "mischief or an intentional willful act" would result in "very serious sanctions."

During the trial, the Plaintiffs offered the testimony of Dr. Jonathan Eisenstat, who was qualified as an expert witness regarding cause of death. Dr. Eisenstat testified that Melvin Hill's cause of death "was the roof crushing down on the back of his head, causing his head to flex forward, and that caused a bruise or a contusion" of the second cervical vertebrae of the spinal cord, which he referred to as "C-2." Later, Ford introduced the testimony of Dr. McNish, who was qualified to testify as an expert witness on injuries in general. Ford's attorney, Alan Thomas, asked Dr. McNish about whether, in his opinion "[Melvin] Hill suffer[ed] the type of injury as Dr. Eisenstat said, this C-2 contusion that resulted in his death?" Dr. McNish answered "No."

The Plaintiffs' attorney objected that "this [was] the exact testimony that the Court ordered before trial this witness could not offer. He's talking about cause of

death. He's disputing Dr. Eisenstat's conclusions about cause of death." Outside of the jury's presence, the parties discussed the testimony further, and the Plaintiffs' attorney moved for Ford's answer to be struck.

After reviewing the transcript over a recess, the trial court announced that:

> In reflecting what happened this morning regarding the testimony of Dr. McNish, the Court finds that testimony was elicited in direct violation of this Court's order in limine. That order had been discussed and expressed in great detail prior to the witness taking the stand. It was in fact the subject of an hour-long colloquy yesterday afternoon.
>
> This Court finds that the defense's violation was willful, has prejudiced the plaintiffs and as a sanction as a minimum, this Court will be telling the jury that the defense counsel and the witness willfully disregarded the Court's instruction and that as a result, they shall disregard Dr. McNish's testimony in its entirety.

The trial court instructed the jury to disregard Dr. McNish's testimony. The Plaintiffs moved for a mistrial based on what they alleged to be violations of multiple orders in limine, culminating in the violation of the McNish Order. Ford's counsel separately moved for a mistrial "on the grounds that this jury has now been prejudiced beyond repair by virtue of the instruction the Court gave." The next day, the trial court granted the Plaintiffs' motion for a mistrial and denied Ford's motion.

b. The sanctions order

The Plaintiffs then filed a post-mistrial motion for sanctions, requesting that the trial court strike Ford's answer. The motion argued that "Ford deliberately procured a mistrial by *willfully* and *repeatedly* violating" the trial court's orders as a strategy to obtain a "compromise verdict" and that the violation of the McNish Order was "merely the last of Ford's violations" of the trial court's orders, which included violations of the Seatbelt and Driver Fault Orders. (Emphasis in original.) The motion also requested, as a sanction, that the trial court order that certain facts related to the design of the truck, Ford's willfulness, and the cause of the Hills' injuries and deaths be taken as established by law during the next trial.

Ford filed a request for an oral hearing pursuant to Georgia Uniform Superior Court Rule 6.3[3] and responded in opposition to the Plaintiffs' motion. After additional briefing, the trial court entered an order sanctioning Ford for its conduct at the first

---

[3] Georgia Uniform Superior Court Rule 6.3 states that, "[u]nless otherwise ordered by the court, all motions in civil actions, including those for summary judgment, shall be decided by the court without oral hearing, except motions for new trial and motions for judgment notwithstanding the verdict. However, oral argument on a motion for summary judgment shall be permitted upon written request made in a separate pleading bearing the caption of the case and entitled 'Request for Oral Hearing,' and provided that such pleading is filed with the motion for summary judgment or filed not later than five (5) days after the time for response."

trial. The trial court stated that it declared a mistrial because of Ford and its counsels' "willful violation" of the McNish Order's prohibition of Dr. McNish giving specific cause of death testimony. The trial court found that this violation was the "culmination of Ford's continuing disregard for several pre-trial evidentiary rulings," including numerous violations of its orders in limine, of which the trial court identified only the McNish, Seatbelt, and Driver Fault Orders. The court found that Ford violated the Seatbelt Order by "deliberately inject[ing] the idea of seatbelt use, as relevant, at least twice, before the jury." The trial court also noted that it told the parties,

> numerous times, that Ford would not be allowed to insinuate that [Melvin] Hill was at fault, or that he was impaired at the time of the accident. Nevertheless, counsel for Ford brought up a GBI post-mortem toxicology-testing report on [Melvin] Hill's blood, in front of the jury, intimating that the results showed that [Melvin] Hill had alcohol in his blood. This example of Ford's willful disregard of the Court's orders in *limine* was particularly troubling, because the toxicology report showed that alcohol was not present in [Melvin] Hill's blood.

As to Ford's violation of the McNish Order, the trial court stated that

> the Court repeatedly restated that Dr. McNish would not be allowed to testify as to the particular cause of the Hills' deaths, but would only be

allowed to testify as to causes of death generally expected in similar accidents. The Court's limitations on the scope of Dr. McNish's testimony were brought up several times by Ford, during the course of trial. Before Dr. McNish was to take the witness stand, Ford's counsel again argued against those limitations. The Court instructed Ford's counsel, Alan Thomas, to explain to McNish, before his testimony began that he would not be allowed to give specific cause of death opinions. Mr. Thomas assured the Court that he would so instruct Dr. McNish, before calling him to the stand. Mr. Thomas went out into the hall for the purpose of giving McNish instruction. Shortly thereafter, McNish began testifying. In clear disregard of the Court's ruling, Mr. Thomas asked Dr. McNish whether he agreed with Plaintiffs' experts' opinion as to the cause of [Melvin] Hill's death. Dr. McNish then opined, before the jury, to the very testimony that the Court prohibited – i.e., his opinion as to the cause of [Melvin] Hill's death. (Footnote omitted.)

The trial court noted that it spent "countless hours" addressing the parties' exclusionary motions but that "defense counsel continually and deliberately injected questions and comments, elicited testimony, and placed documents before the jury, concerning matters that this Court had ruled inadmissible. By this conduct, defense counsel arrogated the Court's gatekeeping function." The court found that Ford and its counsel's actions showed manifest bad faith, and the court blamed Ford specifically, in addition to Ford's counsel. The court also noted that Ford's trial counsel, appellate

8

counsel, and corporate representative were present during the trial. The court then cited its inherent authority to impose sanctions against a party and its attorney to compel obedience to its orders and to control the conduct of its officers in furtherance of justice and expressly found "it appropriate to hold both counsel and Ford responsible for the necessary sanctions."

Finding that they willfully caused a mistrial, the trial court assessed $10,440 against Ford and its counsel, which represented the cost of empaneling a jury. The court reserved the issue of attorney fees under OCGA § 9-15-14. The court further sanctioned Ford for its willful conduct by deeming the following matters established for retrial of the case:

(1) That the roof on the subject 1999-2016 Super Duty trucks was defectively designed and dangerously weak;
(2) That the roof on the subject 1999-2016 Super Duty trucks was susceptible to collapse or crush in a foreseeable rollover wreck which can cause death or serious injury to occupants of the trucks;
(3) That the rollover wreck in this case was foreseeable;
(4) That Ford Motor Company's acts and/or failures to act, in selling trucks with such weak roofs amounted to a willful, and reckless, and a w[a]nton disregard for life, for the purposes of the statute of repose;

(5) That Ford Motor Company knew of the dangers posed by the roofs in the subject trucks and therefore had a duty to warn members of the public of that danger, but willfully failed to warn the public; and

(6) That the defect in the roof of [Melvin] and [Voncile] Hill's truck resulted in roof crush that caused the injuries that led to the deaths of them both.

The order also stated that, "upon the retrial of this case, the only issues that the Court will allow for jury determination are (1) whether there is 'clear and convincing evidence' that punitive damages should be imposed against Ford, (2) whether [Melvin] and/or [Voncile] Hill endured pain and suffering, (3) the amount of compensatory damages, and (4) the amount of punitive damages, if any. With result to punitive damages, the trial will be bi-furcated."[4]

c. The second trial

During the first phase of the second trial, the trial judge instructed the jury that in the prior trial Ford violated several of the trial court's rulings regarding the

---

[4] Ford filed a direct appeal of the sanctions order, but we dismissed the appeal due to Ford's failure to follow the interlocutory appellate procedures set forth in OCGA § 5-6-34 (b). See Case No. A19A1055 (dismissed Jan. 16, 2019).

admissibility of evidence, requiring the trial court to declare a mistrial.[5] As a result, the trial court stated that certain matters were "deemed established," with language that closely tracked the sanctions order.[6]

The jury awarded the Plaintiffs $16 million for wrongful death, $8 million for pain and suffering, $22,500 for the truck, $16,000 for funeral expenses, and $1.7 billion in punitive damages against Ford. The jury also apportioned 70 percent of fault to Ford and 30 percent to Pep Boys. The trial court entered a final judgment of $1,716,826,950 against Ford. Ford filed multiple post-judgment motions, including a motion for new trial and a motion for judgment notwithstanding the verdict, which the trial court denied.

*Case No. A24A0657*

---

[5] The Honorable Shawn Bratton presided over the first trial, while the Honorable Joseph Iannazzone presided over the second trial.

[6] The trial court did not instruct the jury that "Ford Motor Company's acts and/or failures to act, in selling trucks with such weak roofs amounted to a willful, and reckless, and a wonton [sic] disregard for life, for the purposes of the statute of repose[.]"

In Case No. A24A0657, Ford argues that the trial court erred by: (1) imposing what Ford characterizes as "death penalty" sanctions; (2) upholding the punitive damages verdict; and (3) incorrectly resolving multiple evidentiary issues.

II. The motions in limine

"A motion in limine is a pretrial motion that may be used in two ways: (1) to obtain a final ruling on the admissibility of evidence prior to trial or (2) to prevent the mention of certain evidence or an area of inquiry until its admissibility can be determined during the course of trial outside the presence of the jury." (Citation and punctuation omitted.) *Williams v. Harvey*, 311 Ga. 439, 442 (1) (858 SE2d 479) (2021). "The trial court has an absolute right to refuse to decide the admissibility of evidence, allegedly violative of some ordinary rule of evidence, prior to trial." (Citation and punctuation omitted.) Id. at 443 (1). "Where, however, the trial court does rule on the admissibility of evidence or argument prior to trial, this determination controls the subsequent course of action." (Citation and punctuation omitted.) Id. "We are mindful that trial courts are in the best position to determine whether a particular matter violates a motion in limine, whether the violation is unduly prejudicial, and what remedy is appropriate." Id. at 452 (2). Thus, we review a trial court's

determination of whether a ruled-upon motion in limine has been violated only for an abuse of discretion. Id.

We note that a motion in limine to exclude evidence "should be granted only if there is no circumstance under which the evidence is likely to be admissible at trial." (Citation and punctuation omitted.) *Williams*, 311 Ga. at 452 (2). "Thus, the grant of a motion in limine excluding evidence is a judicial power which must be exercised with great care." (Citation and punctuation omitted). Id. "For these reasons, we have explained that a motion in limine and ruling thereon must be narrowly tailored to the evidence and law applicable to each case[.]" Id.

a. Whether Ford violated the McNish Order

Ford first argues that it did not violate the McNish Order. We disagree.

The McNish Order permitted Dr. McNish "to testify as an expert regarding motor vehicle accidents and certain injuries resulting therefrom[.]" But the McNish Order also expressly stated that the trial court "[did] not find that Dr. McNish ha[d] sufficient skill or experience to provide expert opinion as to the cause of death of either decedent."

The following colloquy occurred between the Plaintiffs' counsel and Dr. Eisenstat during direct examination:

Q: All right. Now, the question I had asked you before the interruption, Dr. Eisenstat, was what was it that caused the injuries that led to [Melvin] Hill's death?

A: It was the roof crushing down on the back of his head, causing his head to flex forward, and that caused a bruise or a contusion of the spinal cord.

Q: All right. [Melvin] Hill, causation. Roof crushing down, right?

A: Yes, sir.

Q: Flexion?

A: Yes, sir.

Q: Causes contusion of the spinal cord?

A: Yes, sir.

Q: Where?

A: At the level of the second cervical vertebrae. So that's high up in the neck.

Q: And you call it C-2?

A: C-2.

Later, Ford's attorney asked Dr. McNish whether, in his opinion, Melvin Hill "suffer[ed] the type of injury as Dr. Eisenstat said, this C-2 contusion that resulted in his death?" Dr. McNish answered "No." Ford's question specifically referenced Dr. Eisenstat's testimony about Melvin Hill's cause of death. Ford's counsel's question, and Dr. McNish's answer, was not directed at the types of injuries resulting from crashes or rollover crashes generally. Rather, it was specifically directed at the Hills'

14

cause of death. Thus, Ford has not shown that the trial court abused its discretion by finding that Ford violated the McNish Order. See *Pruette v. Ungarino*, 326 Ga. App. 584, 591-592 (3) (757 SE2d 199) (2014) (trial court did not err in granting doctor's motion for new trial because plaintiff's expert pulmonologist impermissibly referenced doctrine of informed consent in violation of motion in limine order prohibiting any testimony regarding informed consent); see generally *Williams*, 311 Ga. at 442–443.

b. Whether Ford violated the Seatbelt Order

Ford next contends that the trial court erred by finding that it violated the Seatbelt Order. We agree.

In the Seatbelt Order, the trial court cited OCGA § 40-8-76.1 (d), which states in part that "[t]he failure of an occupant of a motor vehicle to wear a seat safety belt in any seat of a motor vehicle which has a seat safety belt or belts shall not be considered evidence of negligence or causation, shall not otherwise be considered by the finder of fact on any question of liability . . . and shall not be evidence used to diminish any recovery for damages . . ." The issue of whether the Hills were wearing their seatbelts during the time of the accident was contested. Ford sought to introduce evidence based on a photograph or photographs allegedly showing one or more occupant's shoulder belt routed under their right arm after the accident. The trial

15

court did not make an evidentiary determination about whether the evidence showed that the seatbelts were improperly tucked. Instead, the trial court ruled that evidence that Melvin and Voncile Hill were not wearing the shoulder portions of their seatbelts must be excluded because the statute indicates that multiple belts may be available and the nonuse of "one of more of these belts" contemplates a case where, as here, there is evidence that one of the belts was not worn. The trial court therefore entered the Seatbelt Order, in which it forbade Ford from referencing "the possibility that the Hills were not wearing the shoulder portions of their safety belts[.]"

In a separate order, the trial court ruled that it would allow Ford's experts to "refer to [National Highway Traffic Safety Administration ("NHTSA")] data (1) to testify as to the rate of rollover incidents resulting in serious injury or fatality, based upon information compiled by the NHTSA and (2) to opine that, based on the rate of rollover incidents, the design of the roof on the Hill truck was reasonable . . . ." The trial court later ruled that it would allow "the crash data" "in on opening." In its opening argument, Ford's attorney displayed a graphic with statistics about injuries in rollover accidents compiled by the NHTSA. That graphic stated that 97.4 % of "belted occupants" avoided serious injuries in rollovers.

Later, the Plaintiffs' attorney cross-examined Ford's witness, Ramnarian Krishnaswami, leading to the following exchange:

Q: All right. Now, you said earlier that rollovers are dangerous events, and you referenced this slide that Ford's lawyer showed the jury in opening statement -- let me find that; here it is -- about 97.4 percent. . . . Okay, there you go. You remember this from Ford's lawyer's opening statement, don't you?
A: Yes.
Q: That's the 97.4 percent you're talking about?
A: Yes.
Q: And it says, in 97.4 percent of real world rollover crashes, 97.4 percent -- means people, I'm sure -- of the people receive no serious injuries and that applied to belted occupants, correct?
A: Yes.

. . .

Q: Isn't it true that, according to Ford's own PowerPoint slide that's up on the screen there, 97.4 percent of belted occupants receive no serious injuries in rollover wrecks?
A: Correct.
Q: That's a good thing, isn't it?
A: It is a good thing, and good for them for using their safety belts.

The Plaintiffs' counsel did not contemporaneously object to this comment, but later, outside of the presence of the jury, the Plaintiffs' counsel asked the trial court to

17

admonish Krishnaswami not to say anything again implying the Hills were not wearing seatbelts. The trial court stated "So I'll be -- I'll just admit to you, I didn't hear him say it. So if he said it, it was fleeting in the Court's ear. We're going to stay away from it." The court then instructed the witness not to make any more references to seatbelts. During Ford's subsequent cross-examination of the Plaintiffs' expert witness, Brian Herbst, Ford's attorney referenced the NHTSA slide, asking, "Okay. Number two, out of that 2 percent that's down there, the studies have shown that 97.4 percent received no serious injuries while they're wearing seatbelts, right?" Plaintiffs' attorney did not contemporaneously object to the question or testimony.

On appeal, Ford contends that it did not violate the Seatbelt Order during its opening because the trial court permitted Ford to use the NHTSA crash data in its opening. That is true. Nor did Ford violate the Seatbelt Order when its expert Krishnaswami stated "[i]t is a good thing, and good for them using their safety belts," as that was his answer to a direct question by the Plaintiffs' attorney about whether it was "a good thing" that 97.4 percent of belted occupants received no serious injuries in rollover crashes. Moreover, Krishnaswami did not comment upon whether Melvin or Voncile used a seatbelt. Likewise, Ford did not comment upon Melvin or Voncile's

18

seatbelt use when it cross-examined Herbst. Thus, we conclude that the trial court abused its discretion by finding that Ford violated the Seatbelt Order.

c. Whether Ford violated the Driver Fault Order

Ford next argues that it did not violate the Driver Fault Order. We agree.

The trial court prohibited Ford from making "[a]rgument or suggestion of driver error or driver fault on the part of Melvin Hill." The Plaintiffs' expert witness, Dr. Eisenstat, was the Chief Medical Examiner for the GBI. During cross-examination, Ford attempted to impeach Dr. Eisenstat based on GBI rules prohibiting its employees from accepting outside employment "[a]rising out of a transaction or occurrence where there has been any GBI involvement." Ford's attorney questioned Dr. Eisenstat about GBI's involvement in the investigation of the case. The following colloquy occurred:

> Q. Well, but you understand that before you can -- as a GBI, before you can take a case, you've got to first determine if there's a conflict, right?
> A. Right. And I looked, and the case had never been called to the medical examiner's office.
> Q. No, I understand. But you accessed the system, right?
> A. There's multiple systems within systems. But, yes, I accessed what's called our LIMS, L-I-M-S system.
>                               . . .

19

Q. Yes. And then you access the GBI system, correct?

A. Again, I accessed one of our systems. That's correct.

Q. And from that system you can see if the GBI has any involvement?

A. In some of the systems, that's correct.

Q. And in this system you saw that the GBI had sent a blood-alcohol kit?

A. No. The GBI didn't send it, but there was a blood-alcohol kit, yes.

Q. So it was involved?

A. Yes.

Ford's attorney later asked Dr. Eisenstat whether he "understood that the GBI had, in fact, been involved to conduct, . . . whether or not there was alcohol involved" in the accident. Dr. Eisenstat then answered "Yes, I know that GBI toxicology was performed." Ford's attorney then asked whether a toxicology report is GBI involvement, to which Dr. Eisenstat answered "Yes." During this questioning, Ford's counsel displayed a GBI toxicology report which showed that alcohol was not present in Melvin Hill's blood.

Here, Ford's counsel displayed to the jury a toxicology report showing that alcohol was *not* present in Melvin Hill's blood and discussed the report with Dr. Eisenstat in order to impeach him. Ford's counsel did not use the report to question Dr. Eisenstat about whether Melvin Hill was at fault. Furthermore, Ford's counsel did not ask Dr. Eisenstat whether Melvin Hill had alcohol in his blood, nor did Ford's

20

counsel suggest it. Instead, Ford used the toxicology report to attempt to impeach Dr. Eisenstat for an alleged violation of GBI policy. On this record, we must conclude that the trial court abused its discretion by finding that Ford's counsel violated the Driver Fault Order by "intimating" that Melvin Hill had alcohol in his blood.

III. Whether the sanctions order exceeded the trial court's authority

We further conclude that the trial court was not permitted to enter issue preclusion sanctions in these particular circumstances.

"The inherent power of courts to enforce their orders is grounded in both the constitution and the Official Code of this state." (Citation and punctuation omitted.) *Clark v. Chapman*, 301 Ga. App. 117, 119 (687 SE2d 146) (2009). Under OCGA § 15-1-3 (3), every court has the power to compel obedience to its orders. Id.; *Bayless v. Bayless*, 280 Ga. 153, 155 (625 SE2d 741) (2006). And under OCGA § 15-1-3 (4), every court has the power to control, in the furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto. *Bayless*, 280 Ga. at 155. The trial court's powers under OCGA § 15-1-3 are broad. See *Eichelkraut v. Camp*, 236 Ga. App. 721, 725 (2) (513 SE2d 267) (1999). And the Georgia Constitution provides that "[e]ach court may exercise such powers as necessary in aid of its jurisdiction or to protect or effectuate its judgments

21

. . . ." Ga. Const. of 1983, Art. VI, Sec. I, Par. IV. "This court will not undertake to control the wide discretion vested in the trial court in the exercise of this fundamental power unless it is made to appear that wrong or oppression has resulted from an abuse of such discretion reposed in the court." (Citation and punctuation omitted.) *Clark*, 301 Ga. App. at 119.

Additionally, it is well-established that Georgia statutory law authorizes a trial court to impose specific sanctions upon a party for violations of an order of the court. For example, OCGA § 9-11-37 empowers trial courts to impose sanctions for failure to obey an order to provide or permit discovery. That statute specifically authorizes trial courts to sanction parties by entering orders which designate that certain facts be taken to be established for purposes of the action, refuse to allow the disobedient party to support or oppose designated claims or defenses, prohibit that party from introducing designated matters into evidence, or strike pleadings. OCGA § 9-11-37 (b) (2) (A) - (C); *Dentistry for Children of Ga. v. Foster*, 362 Ga. App. 217, 218-219 (3) (867 SE2d 617) (2022).

Trial courts may also impose sanctions for failing to appear for pretrial conferences or to meet other obligations related to the preparation of a pretrial order. *American Benefit Corp. v. Parking Co. of America, Inc.*, 310 Ga. App. 765, 767 (714 SE2d

653) (2011). In such cases, the Supreme Court of Georgia has emphasized that upon the failure of a party to participate in the preparation of a pretrial order in direct violation of an order of the court, "no harsher sanctions should be imposed than are necessary to vindicate the court's authority. '[C]ontempt may at times be proper; and in an extreme case the plaintiff's action may be dismissed or the defendant precluded from introducing evidence relating to his defense, but these remedies are too drastic if less harsh sanctions are appropriate.'" *Carder v. Racine Enterprises, Inc.*, 261 Ga. 142, 143 (2) (401 SE2d 688) (1991); *Ambler v. Archer*, 230 Ga. 281, 289 (196 SE2d 835) (1973) (citing with approval 3 Moore's Federal Practice (2 Ed.) 1134, 1135, stating, "no harsher sanctions should be imposed than are necessary to vindicate the court's authority; . . . in an extreme case the plaintiff's action may be dismissed or the defendant precluded from introducing evidence relating to his defense, but these remedies are too drastic if less harsh sanctions are appropriate").

While OCGA § 9-11-41 (b) authorizes the trial court to dismiss a plaintiff's complaint for violations of "any order of court" and OCGA § 9-11-41 (c) extends this authority to the dismissal of counterclaims, cross-claims, or third-party claims, it does not authorize a trial court to impose the sanction of "issue preclusion" against a defendant who violates a court order. The Plaintiffs cite *Wood v. UHS of Peachford,*

*L.P.*, 315 Ga. App. 130, 132 (726 SE2d 422) (2012), for the proposition that a trial court can impose issue preclusion sanctions due to a party's repeated failure to comply with court orders. In *Wood*, we affirmed the trial court's dismissal of a plaintiff's case due to the plaintiff's repeated failure to comply with the trial court's orders, both during discovery and voir dire. *Wood*, 315 Ga. App. at 131. OCGA § 9-11-41 (b) specifically authorizes such a sanction when the offending party is the plaintiff.

The Plaintiffs cite to *Bayless* for the proposition that trial courts may strike defensive pleadings as a sanction for violating court orders. But in *Bayless*, the Supreme Court affirmed the striking of a defendant's answer due to his failure to personally appear in court, in direct violation of a court order. *Bayless*, 280 Ga. at 155-156 (1). And in *Bayless*, the defendant failed to attend three prior court hearings. Here, the parties have not directed this Court to any case where the striking of a defensive pleading was upheld on appeal in Georgia for something other than the defendant's failure to participate in the court's proceedings. See, e.g., *Bayless*, 280 Ga. at 155-156; *American Benefit Corp.*, 310 Ga. App. at 767 (1) (affirming striking of defensive pleadings where defendants failed to submit a pretrial order and failed to appear at either the pretrial conference or at trial).

Applying these principles to the facts of this case, we consider the wilful and intentional violation of an order in limine to be an even greater transgression than the failure to properly respond to discovery or participate in the preparation of a pretrial order. While all of these failures involve a violation of a court's order, the intentional violation of an order in limine constitutes a more direct affront to the court's authority. The order in limine issued in this case was the product of significant pretrial litigation, briefing, and argument. After hearing from both parties, the trial court entered an order in limine. The trial judge then went further, advising the parties prior to opening statements that violation of the orders in limine would subject the offending party to "very serious sanctions," particularly if the violations were designed to secure a declaration of a mistrial.

Nonetheless, the parties have not identified, nor have we found, any Georgia case in which the trial court effectively struck the defendant's pleadings and imposed issue preclusion in a subsequent trial as a sanction for violating an order in limine. Moreover, even if these sanctions were available to the trial court, lesser sanctions were likewise available. "The contempt power of the court and the provisions of OCGA § 9-15-14 are illustrative of the array of sanctions available which stop short of foreclosing the presentation of the merits of one side of a controversy." See *Carder*,

261 Ga. at 144 (2); *Boatright v. First Nat. Bank of Alma*, 166 Ga. App. 167, 167 (1) (303 SE2d 506) (1983) (reversing the trial court's order striking a defendant's answer and entering judgment against him as too harsh a sanction to impose upon him for his counsel's failure to appear at a pretrial conference where the disposition resulted from considerations not related to the merits of the case); *All South Mini Storage No. 2, Ltd. v. Woodcon Constr. Svcs., Inc.*, 205 Ga. App. 393, 394 (422 SE2d 282) (1992).

Accordingly, we vacate the portion of the Sanctions Order that established the facts for retrial and left for retrial only the issues of "(1) whether there is 'clear and convincing evidence' that punitive damages should be imposed against Ford, (2) whether Mr. and/or Mrs. Hill endured pain and suffering, (3) the amount of compensatory damages, and (4) the amount of punitive damages, if any." On remand, the trial court may elect to revisit the issue of sanctions against Ford in accordance with this opinion and impose whatever permissible sanctions it deems appropriate. However, we find that, under the facts of this case, issue preclusion is not among the available sanctions for the violation of the order in limine.

Because we vacate the trial court's order imposing the issue preclusion sanctions, which almost completely prevented Ford from presenting a defense as to

liability, we are also compelled to vacate the jury's verdict and final judgment based on those sanctions, and we must remand for another trial to be conducted.

IV. Whether the trial court erroneously upheld the punitive damages award

Ford also argues that the trial court erroneously upheld the punitive damages award. Because in Division III we vacate the trial court's award of compensatory damages and punitive damages, we do not reach this argument.

V. Whether the trial court erroneously resolved several evidentiary issues.

Ford also argues that the trial court erred in resolving three evidentiary disputes. Specifically, Ford contends that the trial court erred by (1) excluding evidence of improper seatbelt use and driver error; (2) admitting the Plaintiffs' evidence of other similar incidents ("OSIs"); and (3) excluding Ford's scientific testing evidence based on a misapplication of OCGA § 24-4-403. We will address these enumerations of error to the extent that they are likely to recur during the retrial of the case. *Ford Motor Co. v. Reese*, 300 Ga. App. 82, 88 (1) (684 SE2d 279) (2009).

a. Seatbelt evidence

Ford argues that the trial court erred in entering the Seatbelt Order based on its determination that OCGA § 40-8-76.1 (d) prohibited the introduction of evidence about whether the Hills allegedly tucked the chest strap portion of their respective

27

seatbelts under their arm instead of wearing the belts across the chest and over the shoulder. We agree.

> When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. . . . Applying these principles, if the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.

(Citations and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013). Indeed, "[a]s long as the statutory language is clear and does not lead to an unreasonable or absurd result, it is the sole evidence of the ultimate legislative intent." (Citation and punctuation omitted.) *Lumpkin County v. Ga. Insurers Insolvency Pool*, 292 Ga. 76, 78 (2) (734 SE2d 880) (2012).

As set forth above, under OCGA § 40-8-76.1 (d),

> [t]he failure of an occupant of a motor vehicle to wear a seat safety belt in any seat of a motor vehicle which has a seat safety belt or belts shall not be considered evidence of negligence or causation, shall not otherwise be considered by the finder of fact on any question of liability of any person,

28

corporation, or insurer, shall not be any basis for cancellation of coverage or increase in insurance rates, and shall not be evidence used to diminish any recovery for damages arising out of the ownership, maintenance, occupancy, or operation of a motor vehicle.

Although the statute does not define what it means "to wear a seat safety belt," the Merriam-Webster Dictionary defines the verb "wear" as "to bear or have on the person." [7]

In *Domingue v. Ford Motor Co.*, 314 Ga. 59 (875 SE2d 720) (2022), the Supreme Court of Georgia stated that "the statutory restrictions in OCGA § 40-8-76.1 are all predicated on the 'failure of an occupant of a motor vehicle to wear a safety belt.'" *Domingue*, 314 Ga. at 63 (2) (a) (citation and punctuation omitted). The Supreme Court went on to state that "[b]ecause the existence of seatbelts in a vehicle is something other than the failure of an occupant of a motor vehicle to wear a seat safety belt, . . . [the statute] does not restrict use or consideration of that evidence." Id. The Supreme Court further stated that

the statute does not restrict consideration of seatbelt use. Of course, trial courts may determine, based on the relevant rules of evidence and the

---

[7] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/wear (visited Oct. 31, 2024).

facts of a particular case, that evidence of a vehicle occupant's seatbelt use is not relevant, is unfairly prejudicial, or is otherwise not admissible. Such determinations, however, are not mandated by the text of OCGA § 40-8-76.1 (d).

Id. at 64 (2) (a) n.5.

Although the Supreme Court's statement as to the consideration of seatbelt use appears to be dicta, we nevertheless find it persuasive to the correct interpretation of the plain language of OCGA § 40-8-76.1 (d). That is, if a seatbelt is not worn at all – i.e., it is not "on the person" – then the statute would exclude evidence of the complete failure to wear the belt. But if a seatbelt is indeed worn -- i. e., it is on the person – but it is worn in the wrong way, then the statute does not operate to exclude the evidence. As stated above, "we must presume that the General Assembly meant what it said and said what it meant." (Citations and punctuation omitted.) *Deal*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) If the Legislature had intended to completely restrict all evidence concerning seat belt use, they could have easily said so. But that is not the statute that they wrote.

Here, Ford sought to submit evidence that the Hills allegedly tucked the shoulder straps of their seat belts under their arms instead of wearing them across their

chests and shoulders. A person who tucks a seat belt underneath his or her arm is indeed "wearing" the belt because it is still on their person across their midsection; albeit, that person would be wearing the belt improperly. Ford is therefore not seeking to introduce evidence that the Hills had failed to "wear" the shoulder straps to their seat belts, and we conclude that this evidence is not barred by OCGA § 40-8-76.1 (d) and that the jury should be able to consider it in aggravation or in mitigation or for any purpose that is relevant. The trial court thus abused its discretion by concluding otherwise and excluding the evidence.

b. Scientific study evidence

Ford also contends that the trial court erred by entering two orders in limine which excluded critical scientific testing about the relationship between rollover injuries and roof deformation. In the first of these orders, the trial court granted the Plaintiffs' motion to exclude evidence of the so-called "Malibu" study and its follow up "CRIS" study and denied Ford's motion to admit this evidence. Ford contends that the trial court's order excluded the Malibu and CRIS tests under an erroneous "more prejudicial than probative" standard. We agree.

Under OCGA § 24-4-403 ("Rule 403"), "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here, the trial court's order merely stated that the tests "are certainly more prejudicial than probative." This is not the correct standard - the correct standard is whether the probative value is "substantially outweighed" by "unfair prejudice," not just prejudice generally. Rule 403 requires that the trial court make a determination that is more expansive than merely weighing the probative value against the prejudicial effect of the evidence. The trial court therefore erred when it performed its Rule 403 analysis. See *State v. Jackson*, 351 Ga. App. 675, 677 (832 SE2d 654) (2019) (abuse of discretion standard does not permit application of wrong legal standard). Accordingly, we vacate the trial court's order excluding the Malibu and CRIS tests and remand for the trial court to review the tests under the correct standard.

We decline to address, however, whether the trial court otherwise properly excluded the Malibu and CRIS tests or whether the trial court erred in granting the Plaintiffs' motion in limine by excluding Ford's inverted drop tests and "ROCS" tests in a separate order because we do not have enough information to ascertain whether the trial court abused its discretion by excluding these tests under Rule 403. Nonetheless, the trial court should review its rulings on the admissibility of these tests

specifically including, under Rule 403, a determination as to whether the probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

c. The trial court's remaining evidentiary determinations

Ford also argues that the trial court erred in admitting 79 OSIs, claiming those other incidents constituted hearsay, an issue which Ford also contends the Plaintiffs "devoted substantial time to . . . during trial." We conclude, however, that Ford has abandoned this claim of error because its briefing does not provide this Court with enough information or argument needed to address this issue. See Court of Appeals Rule 25 (d) (1) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned"). Specifically, we note that Ford does not identify any particular statements that are allegedly inadmissible hearsay, nor does it meaningfully argue how the OSIs are inadmissible under the hearsay rules.

Finally, Ford contends that the trial court erred in excluding the driver fault evidence. Ford's driver fault evidence consisted of evidence that Melvin Hill requested that Pep Boys install the wrong tire on the truck, that Melvin Hill mishandled the truck after its tire blew out, that there were multiple substances in Melvin Hill's blood that

exceeded the therapeutic range, and that additive and synergistic effects of multiple medications taken concomitantly can result in impairment. With respect to the argument that the trial court erred by excluding evidence of driver fault, Ford contends that the amount of compensatory damages awarded to the Plaintiffs must account for Georgia's comparative fault statute, which, according to OCGA § 51-12-33 (a), "reduce[s] the amount of damages otherwise awarded to the plaintiff" if "the plaintiff is to some degree responsible for the injury or damages claimed." Unlike the trial court's exclusion of the seat belt evidence according to OCGA § 40-8-76.1 (d), the evidentiary posture may change upon remand, and the trial court may choose to reconsider its evidentiary rulings concerning the OSIs, testing evidence, and other driver fault evidence. Accordingly, we do not address Ford's arguments concerning the trial court's other evidentiary rulings. See *Martin v. Six Flags Over Ga. II, L.P.*, 301 Ga. 323, 341 (II) (b) n.13 (801 SE2d 24) (2017) ("The scope of evidence to be presented on retrial is, of course, an issue to be addressed in the trial court.").

### Case No. A24A0658

VI. The State of Georgia's motion to intervene

The State of Georgia argues that the trial court erred in denying its motion to intervene to protect its 75% interest in the punitive damages award consistent with

OCGA §§ 9-11-24 and 51-12-5.1 (e). Because we vacate the jury's punitive damages award, this appeal is dismissed as moot.

Case No. A24A0659

VII. The sanctions against Ford's attorneys

The attorneys for Ford in the trial court appeal the trial court's order sanctioning them personally, arguing that (1) the trial court abused its discretion by sanctioning them without affording them fundamental due process, including notice and a meaningful opportunity to be heard; and (2) the trial court abused its discretion because they did not violate any motions in limine and because the Plaintiffs did not make contemporaneous objections at trial to the violations referred to in the trial court's order.

a. The Plaintiffs' motion to dismiss

We first address the Plaintiffs' motion to dismiss this appeal, wherein they argue that Ford's attorneys were not personally sanctioned and that they do not have standing to appeal the sanction in their own right. Rather, the Plaintiffs contend that this appeal is a mechanism to "double the number of briefing pages before this Court." We, however, disagree.

The sanctions order is clear that both Ford and its attorneys were sanctioned. Not only did the court find that Ford and its counsels' actions showed manifest bad faith, it expressly found that "it is appropriate to hold both counsel and Ford responsible for the necessary sanctions." Additionally, although the trial court indicated that it would enter an order vacating the Sanctions Order as to Ford's attorneys during the hearing on Ford's motion to vacate the Sanctions Order, the trial court did not do this. Instead, the trial court entered a standard order denying the motion. "[U]ntil an oral pronouncement is memorialized, the trial judge has broad discretion to amend, alter, or completely change his decision, and any discrepancy between the oral pronouncement and the written ruling will be resolved in favor of the written judgment." *Mondy v. Magnolia Advanced Materials, Inc.*, 303 Ga. 764, 772 (4) (b) (815 SE2d 70) (2018). Thus, the fact that the trial court stated at the hearing that it would grant the motion filed by Ford's attorneys does not change that the sanctions order directly sanctioned Ford's attorneys. Accordingly, we deny the Plaintiffs' motion to dismiss.

b. Whether the trial court abused its discretion by sanctioning the attorneys

First, Ford's attorneys contend that they were not provided with notice and a meaningful opportunity to be heard. We disagree. After the trial court sanctioned Ford

and its attorneys, Ford's attorneys filed a "motion to vacate, or in the alternative, motion to reconsider sanctions imposed against 'Ford's lawyers.'" The trial court denied the motion after a hearing. "Since [Ford's attorneys] were afforded a full opportunity, with adequate notice, to present their opposition to the imposition of sanctions, the initial lack of a hearing does not require reversal." *Carder*, 261 Ga. at 142 (1). Additionally, while Ford's attorneys argue that the trial court's powers to compel compliance with its orders were limited to contempt, they cite no authority for this proposition. See Court of Appeals Rule 25 (d) (1). Nor do we agree. See *Eichelkraut*, 236 Ga. App. at 725 (2) (the trial court's powers are broad).

c. Whether the attorneys' conduct warranted sanctions

Ford's attorneys argue that the trial court abused its discretion by sanctioning them because they did not violate the orders in limine and because the Plaintiffs did not make contemporaneous objections. This is incorrect. As set forth in Divisions II (a) and III, supra, Ford and Alan Thomas violated the McNish Order, the Plaintiffs' counsel contemporaneously objected, and the trial court concluded that the violation was committed in bad faith.[8] The violation of the order in limine was serious enough

---

[8] Because we conclude that Ford did not violate the other two relevant orders, which did not involve contemporaneous objections by the Plaintiffs, we need not

to warrant a mistrial in an extremely important, expensive, complicated, and time-consuming case, thereby wasting a substantial amount of precious judicial resources as well as the time and money of both the Plaintiffs and Ford itself. Thus, we determine that the conduct of Alan Thomas warranted the sanctions imposed.

d. Whether the sanction was appropriate as to all of Ford's attorneys

Ford's attorneys argue that "the level of involvement and roles of Ford's lawyers varied greatly" and that the Sanctions Order "lumped" them all together. We agree that this was impermissible. The trial court's ruling expressly stated that "[i]t was Mr. Thomas' conduct that ultimately caused the Court to declare a mistrial[,]" and it did not identify any improper conduct by Ford's other attorneys. Accordingly, we reverse the trial court's sanctions order to the extent it sanctioned J. Randolph Evans, Audrey Berland, Michael Eady, Michael Boorman, Philip Henderson, and Paul Malek.

*Conclusion*

Upon remand, the trial court should vacate the portions of the sanctions order that found that Ford violated the seat belt and driver fault orders and reverse the

---

decide today whether a contemporaneous objection is a prerequisite to a trial court's authority to enforce its own orders.

38

portion that sanctioned Ford's counsel other than Alan Thomas. The trial court should also vacate the awards of compensatory damages and punitive damages. The trial court should also vacate the order excluding the Malibu and CRIS tests, so that the trial court can properly evaluate this evidence under Rule 403. The trial court should then conduct a new trial consistent with this opinion. Prior to the new trial, the trial court should revisit the admissibility of Ford's inverted drop and ROCS tests, the Plaintiffs' OSI evidence, and the evidence of the Hills' fault (excluding the seat belt evidence). The trial court may also choose to revisit the issue of what sanctions are appropriate to enter against Ford.[9]

*Judgment affirmed in part, reversed in part, vacated in part, and case remanded in Case No. A24A0657, appeal dismissed as moot in Case No. A24A0658, and judgment affirmed in part and reversed in part in Case No. A24A0659. Markle, J., concurs. Padgett, J., concurs in part and dissents as to Division V (a).*

---

[9] I am so very privileged and honored to have served the people of the State of Georgia on the Court of Appeals for the past 25 years. I would also like to thank my esteemed colleagues and fellow court personnel for making these past 25 years such a meaningful experience.

# In the Court of Appeals of Georgia

A24A0657. FORD MOTOR COMPANY v. KIM HILL et al.

A24A0658. STATE OF GEORGIA v. FORD MOTOR COMPANY et al.;

A24A0659. THOMAS et al v. HILL et al.

PADGETT, Judge, dissenting in part.

I concur completely with everything the majority says except that I respectfully dissent from the conclusion reached in Division V (a) which holds that the seatbelt evidence may have been permissible under OCGA § 40-8-76.1 (d).

As set forth in the majority's opinion, under OCGA § 40-8-76.1 (d)

The failure of an occupant of a motor vehicle to wear a seat safety belt in any seat of a motor vehicle which has a seat safety belt or belts shall not be considered evidence of negligence or causation, shall not otherwise be considered by the finder of fact on any question of liability of any person, corporation, or insurer, shall not be any basis for cancellation of coverage or increase in insurance rates, and shall not be evidence used to diminish any recovery for damages arising out of the ownership, maintenance, occupancy, or operation of a motor vehicle.

Ford cites to the Supreme Court's opinion in *Domingue v. Ford Motor Co.*, 314 Ga. 59 (875 SE2d 720) (2022), for the proposition that Ford's proffered seatbelt misuse evidence is permissible. That is not, however, what the Supreme Court said in *Domingue*. Ford is right that the Supreme Court held in *Domingue* that "the statutory restrictions in OCGA § 40-8-76.1 are all predicated on the 'failure of an occupant of a motor vehicle to wear a safety belt.'" *Domingue*, 314 Ga. at 63 (2) (a) (citation and punctuation omitted). The Supreme Court went on to state that "[b]ecause the existence of seatbelts in a vehicle is something other than the failure of an occupant of a motor vehicle to wear a seat safety belt, . . . [the statute] does not restrict use or consideration of that evidence." Id. But Ford is wrong in concluding that *Domingue* stands for the proposition that evidence of seatbelt misuse is permissible. It is true that the Supreme Court stated in dicta that

2

the statute does not restrict consideration of seatbelt use. Of course, trial courts may determine, based on the relevant rules of evidence and the facts of a particular case, that evidence of a vehicle occupant's seatbelt use is not relevant, is unfairly prejudicial, or is otherwise not admissible. Such determinations, however, are not mandated by the text of OCGA § 40-8-76.1 (d).

Id. at 64 (2) (a) n.5. However, we need only look at the plain meaning of the statute to decide this issue.

When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. . . . Applying these principles, if the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.

*Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013) (citations and punctuation omitted). Indeed, "[a]s long as the statutory language is clear and does not lead to an unreasonable or absurd result, it is the sole evidence of the ultimate

legislative intent." *Lumpkin County v. Georgia Insurers Insolvency Pool*, 292 Ga. 76, 78 (2) (734 SE2d 880) (2012) (citation and punctuation omitted).

As set forth above, the statute contemplates that a person in an automobile may have access to multiple belts, like the Hills here, and that the failure to use any of the belts – such as the shoulder belt – is inadmissible. Thus, under OCGA § 40-8-76.1, the trial court properly excluded evidence that the Hills allegedly tucked their seatbelts under their arms instead of wearing them across their chests and shoulders.

As the majority noted, "wear" may be defined as "to bear or have on the person." But moving a seatbelt away from the chest or shoulder and tucking it behind or under the body or an arm is neither bearing something nor having it on someone's person. And, more to the point, a person does not "wear" a seatbelt by merely touching it, which is all that could be said the Hills were apparently doing with their shoulder belts. Rather, someone wears a seatbelt by crossing it across the body for restraint. This conclusion is supported by our case law and another subdivision of OCGA § 40-8-67.1. Under OCGA § 40-8-76.1 (b), "[e]ach occupant of the front seat of a passenger vehicle shall, while such passenger vehicle is being operated . . . *be restrained* by a seat safety belt . . ." (emphasis added). Although that subdivision sets forth that a person must "be restrained" by a seatbelt, rather than "wear" a seatbelt,

we have previously stated that "not wearing a seatbelt is a violation of OCGA § 40-8-76.1 (b)." See *Taylor v. State*, 263 Ga. App. 420, 422 (587 SE2d 791) (2003); see also *Clark v. State*, 305 Ga. App. 699, 700 (1) (700 SE2d 682) (2010) ("A seat belt violation—including a motorist's failure to use a shoulder strap—is a proper basis for a traffic stop.").

And while we do not appear to have addressed this exact issue before, we have previously discussed what it means to wear a seatbelt in ways inconsistent with the majority's opinion. For example, in *Davis v. State*, 318 Ga. App. 166, 167 (733 SE2d 453) (2012), we characterized the defendant's tucking of a shoulder strap under his arm while also wearing the lap belt as wearing only "a portion" of the seatbelt. In other words, the defendant was not wearing the shoulder belt even though it was, as is alleged in this case, tucked under his arm.

So, the Hills' alleged actions of trucking their seatbelts underneath their arms are actions inconsistent with wearing a seatbelt. They were allegedly not wearing a portion of the seatbelt and, under the directives of OCGA § 40-8-76.1 (d), that evidence is not admissible. For this reason, I respectfully dissent to Division V (a) of the opinion.